CJB

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name BRODSKY CLIFFORD
(Last) (First) (Initial)

E-filing

Prisoner Number H-07665

Institutional Address CTF Soledad, P.O. Box 689, Soledad, CA 93960-0689

FILED
FEB 29 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CLIFFORD BRODSKY
(Enter the full name of plaintiff in this action.)

vs.

B. CURRY, Warden (A)
BOARD OF PAROLE HEARINGS

(Enter the full name of respondent(s) or jailor in this action)

CV 08 1218

Case No. ______
(To be provided by the clerk of court)

**PETITION FOR A WRIT OF HABEAS CORPUS**

CRB

(PR)

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Los Angeles County Superior Court — Los Angeles, CA

Court — Location

(b) Case number, if known BA 000576

(c) Date and terms of sentence August 23, 1991 / 15 Years to Life

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes X No ____

Where?

Name of Institution: CTF Soledad

Address: P.O. Box 689, Soledad, CA 93960-0689

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Conspiracy to Commit Murder of the Second Degree

Penal Code § 182 / § 187

3. Did you have any of the following?

Arraignment: Yes X No ____

Preliminary Hearing: Yes X No ____

Motion to Suppress: Yes X No ____

4. How did you plead?

Guilty X Not Guilty ____ Nolo Contendere X

Any other plea (specify) ____________________

5. If you went to trial, what kind of trial did you have?

Jury ____ Judge alone ____ Judge alone on a transcript ____

6. Did you testify at your trial? Yes X No ____

7. Did you have an attorney at the following proceedings:

(a) Arraignment Yes X No ____

(b) Preliminary hearing Yes X No ____

(c) Time of plea Yes X No ____

(d) Trial Yes N/A No ____

(e) Sentencing Yes X No ____

(f) Appeal Yes X No ____

(g) Other post-conviction proceeding Yes N/A No ____

8. Did you appeal your conviction? Yes X No ____

(a) If you did, to what court(s) did you appeal?

Court of Appeal Yes X No ____

Year: 1993 Result: DENIED

Supreme Court of California Yes X No ____

Year: 1993 Result: DENIED

Any other court Yes ____ No ____

Year: ____ Result: ____________________

(b) If you appealed, were the grounds the same as those that you are raising in this

petition? Different Matter Yes ____ No X

(c) Was there an opinion? Yes X No ____

(d) Did you seek permission to file a late appeal under Rule 31(a)?

Yes ____ No X

If you did, give the name of the court and the result:

N/A

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal? Yes ____ No X

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I. Name of Court: Los Angeles County Superior Court

Type of Proceeding: Habeas Corpus

Grounds raised (Be brief but specific):

a. No reliable evidence supports parole denial decision.

b. No reliable evidence shows Petitioner is currently a threat to society.

c. District Attorney failed to provide Petitioner owed benefit.

d. ____

Result: Denied Date of Result: 9/13/07

II. Name of Court: California Court of Appeals

Type of Proceeding: Habeas Corpus

Grounds raised (Be brief but specific):

a. Same as in Superior Court

b.

c.

d.

Result: Denied Date of Result: 12/07/07

III. Name of Court:

Type of Proceeding: California Supreme Court

Grounds raised (Be brief but specific):

a. Same as in Superior Court

b.

c.

d.

Result: Denied Date of Result: 2/20/2008

IV. Name of Court:

Type of Proceeding:

Grounds raised (Be brief but specific):

a.

b.

c.

d.

Result: Date of Result:

(b) Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes X No

Name and location of court: Ninth Circuit, L.A. Supreme Court

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

need more space. Answer the same questions for each claim.

[Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

Claim One: The parole board's decision to deny parole based on the nature of Petitioner's 1989 inchoate conspiracy to commit a second degree murder 15+ years after his imprisonment, despite his exemplary prison record and lack of any prior criminality, deprived him of his federally protected right to due process.

Supporting Facts: On November 6, 2006, subsequent to serving his minimum 15 year term, Petitioner, for the fifth time, was found unsuitable for parole (Exhibits A and B) solely on the basis of his inchoate conspiracy to commit second degree murder offense. (Cont'd. on page 8.)

Claim Two: No (federally required) reliable evidence demonstrates Petitioner would currently pose an unreasonable threat to public safety, if released to parole.

Supporting Facts: Same as Claim One.

Claim Three: With or without prejudicial impact, the district attorney's failure on November 6, 2006, to provide Petitioner expressly promised benefits requires he be granted relief.

Supporting Facts: At plea, the prosecutor expressly promised that when Petitioner appeared before the parole board, his office would not oppose his release and would represent the disposition of this case to the parole authorities at that time, which they failed to do. (See paragraph 13, et. al.)

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

Not Applicable

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

See Supporting Facts and Memorandum of Points and Authorities.

Do you have an attorney for this petition? Yes____ No X

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on February 27, 2008 [signature]

Date Signature of Petitioner

(Rev. 6/02)

## INTRODUCTION

### A. The Offense and Conviction

In August 1988, Petitioner and two others who managed or invested in several businesses sold their 50% interest in one of those companies to Robert Krugman, who owned the other 50% of that enterprise. In return for acquiring their fifty percent, his company was to repay, on an installment basis, the approximately $1.1 million funding Petitioner and others had arranged for that company's start-up financing. As the viability of that company now depended on Mr. Krugman's skills, he provided a keyman life insurance policy for payment to the lending company of any outstanding debt in the event of his death. After making some payments he refused to make others, alleging improprieties in the deal. Unable to resolve this impasse, and becoming increasingly angry due to the large amount of unpaid dept, between March and July 1989, Petitioner and several others concocted a scheme to obtain repayment of that debt from the life insurance policy by hiring two hit-men to murder Mr. Krugman. The scheme was foiled when a plot participant, a security guard from the business, notified the police who disrupted the plot and intercepted the hit-men prior to the murder.

On July 10, 1991, after having been free on bail for two years, Petitioner pled guilty and was accordingly convicted, and on August 23, 1991, was sentenced to 15 years to life. (Exhibit C.) On August 30, 1991, as arranged by the court, Petitioner surrendered from bail directly to the Department of Corrections at their CIM Chino Reception Center to begin serving his life sentence .

### B. Prior History and Post-Offense Record

Other than his commitment offense Petitioner has no criminal history whatsoever and had a stable social history. (Exhibit A, p. 52.) After earning his B.S. Degree in 1965, Petitioner served as a Naval Officer for several years (Exhibit D), then spent two decades managing the development of complex business computer software systems. Subsequently, Petitioner and others invested in several businesses. As evidenced in the transcript, and Exhibit L, his letters of support show Petitioner's ties to his family and the community remain strong, resulting in his having offers of residence, employment in a family business, and other support when released. As also noted by the panel he has remained totally disciplinary free in prison, completed three vocational programs, and attended numerous self-help groups. The CDCR psychological reports prepared to evaluate Petitioner support

his parole, including the last two specially requested by the Board. Evaluations which found that given his prior history, crime facts, understanding of its causes, his exemplary prison record and his parole plans, his release would pose no more of a threat to the public then the average citizen, and he would be more successful on parole than almost every other inmate. (See Exhibit E.)

**C. The Board's Decision**[1]

The Board's fifth decision to deny parole rested solely on their characterization of the crime as carried out in an especially cruel and very callous manner (Exhibit A, p. 51) and in a dispassionate and calculated manner (Id. at pp. 51-52), as having a motive which was inexplicable and very trivial (Id. at 52), and because the prisoner conspired with another person to murder [the intended victim] (Id. at 52).

First, especially cruel or callous crimes are those wherein the offender subjected the victim to prolonged torturous pain, contrary to the instant offense where the victim was neither injured or killed. Second, a crime motivated by a desire (however wrong) to recover $1.1 million cannot be inexplicable and trivial. Further, as the record shows (Exh. B, Exh. E) Petitioner's actions were driven by his anger "over the large sum of unpaid dept withheld by the intended victim[2], and when the motivation for the crime is anger, it is not a passionless crime. (Arave v. Creech (1993) 507 U.S. 463, 472, 113 S.Ct. 1534, 1541, 1543; In re Weider (2006) 145 Cal.App.4th 570, 588; In re Grey (2007) 151 Cal.App.4th 379, 406-407.) In addition, addressing the nature of all conspiracies to murder, the State Supreme Court held in In People v. Cortez (1998) 18 Cal.4th 1226, 1233, that regardless of the alleged target offense degree, "that where two or more people conspire to commit murder – intend to agree or conspire, [and] further intend to commit the target offense of murder – and perform one or more overt acts in furtherance of the planned murder – each acted with a state of mind functionally indistinguishable from the mental state of premeditating the target offense – murder (citation)."

---

[1] Petitioner was previously denied parole for a period of one year in 2001, 2002, 2003, and 2005. His 2001 and 2005 hearings were held over a year late. Copies of the decision from those hearings are included as Exhibit B merely to demonstrate their occurrences. Furthermore, Petitioner made his sixth appearance before the Board on November 5, 2007, and was again denied parole despite his "exemplary" and disciplinary free record and parole supportive psychological reports. See Exhibit G, included only to demonstrate the futility of Petitioner's Board appearances, as that matter is still before the state court.

[2] While the core underlying force driving Petitioner's reaction in this matter was his anger over the very large amount of money being withheld by the intended victim, as Petitioner has repeatedly explained, and the CDCR psychologists analyzed, his actions were also driven by his then competitive tendencies and its rigid application. Completion tendencies and anger he has learned to control as demonstrated by his remaining disciplinary free in the competitive turmoil of a prison environment for his entire (now) 16½ years of imprisonment.

Since all conspiracies to murder are at a minimum calculated, i.e., intended and/or premeditated, in nature the presence of calculation is the minimum necessary to sustain a conviction for that offense, and thus its use to support parole denial offends due process under the standards of In re Rosenkrantz (2002) 29 4th 616, 683. Further, given Petitioner's prior crime free history and post-conviction exemplary record, the value of his now 18½ years old offense facts as a measure for predicting future criminal acts is at best nil and thus no longer constitute some evidence. (In re Lee (2006) 143 Cal.App.4th 1400, 1408 [review denied].)[3]

**STATEMENT OF THE FACTS**

1. After the intended victim refused to repay a $1.1 million business debt owed the company they managed and controlled, Petitioner and several others concocted a scheme to obtain proceeds from a life insurance policy the intended victim had taken it out to repay any outstanding debt in the event of his death. The plot was foiled when interrupted by the police.

2. While free on bail, Petitioner admitted responsibility for his role in the offense, as described above in the introduction, pleading guilty on July 10, 1991, to the offense of conspiracy to commit a second-degree murder, as stipulated by the People and approved by trial court. After pleading guilty Petitioner remained free on bail without stated restrictions or monitoring, other than being required to appear in court for sentencing. (Exhibit C.)

3. On August 23, 1991, Petitioner was sentenced to 15 years to life, then again released on bail, and with the prosecutor's agreement, self-surrendered from bail to the Department of Corrections on August 30, 1991, to begin serving his sentence. (Exhibit C.)

4. Statutory law (Penal Code § 1272.1) prohibits release of an offender on post-conviction bail if the crime or other facts indicate they would be a threat to society or any person, and requires the court to make that consideration prior to their release. Post-sentencing bail release, again without stated restrictions or monitoring, is so unusual for someone sentenced to a years to life indeterminate term, it must demonstrate the court and prosecutor understood Petitioner had accepted responsibility for his criminal acts and was demonstrating his remorse by being willing to be (in the prosecutor's

---

[3] This holding of In re Lee 143 Cal.App.4th at 1408 was recently adopted (relied upon) by the Ninth Circuit in Hayward v. Marshall (9th Cir. 2008) 2008 U.S. App. LEXIS 40, *17 - *19. Also see In re Hofferber (1980) 28 Cal.3d 161, 177 ("the passage of time itself diminishes the validity of an assumption [a prisoner's] dangerousness remains unabated.

words) "fairly punished." A situational bail release which also shows the neither the court nor the prosecutor found Petitioner to be a threat to society or to any person.

5. On November 6, 2006, 15+ years after his imprisonment and 17+ years after committing his crime[4], Petitioner appeared before the Board for the fifth time and was again denied parole for a one-year period. (See Exh. A, Decision pages.)

6. During the decision, the Board carefully delineated each non-offense factor and found none to support parole denial. Specially, the panel noted, "The prisoner does come from a stable on all counts, a very stable social background with no criminal history…With regards to institutional behavior, the Petitioner participated in beneficial self-help therapy and programs…I would like to note that he lacks misconduct while incarcerated. He does not have any 128 counseling chrono's or serious 115 disciplinary reports. The psychology report dated August 25th of 2006, authored by Dr. Marak is supportive for release. In regard to your parole plans, you do have solid parole plans…[T]he prisoner is to be commended for his earning multiple vocations as well as his excellent work ratings, participation in self-help group(s), as well as remaining disciplinary free throughout his incarceration." (Exh. A, pp. 52:20-26, 54:1.)[5]

7. As phrased by the Board, their decision to deny parole in this case was "based on the commitment offense." As noted both ante and below, the Board's supporting characterizations were either contrary to case factors or law, or constituted the minimum necessary factual elements to sustain conviction for a conspiracy to commit murder, and thus were not available as reasons supporting a parole denial. (Exh. A, pp. 51-53.)

8. To be factually supported, the Board's finding "the offense [in this case] was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering" requires that Petitioner had intended the infliction of prolonged torturous pain on the victim (In re Rosenkrantz

---

[4] The court in In re Lee, 143 Cal.App.4th at 1412, notes it is the passing of time since a prisoner "committed" their crime that reduces it predictive value, not just the amount of time a prisoner has been incarcerated. Similarly, see In re Hofferber(1980) 28 Cal.3d 161, 177 ("the passage of time itself diminishes the validity of an assumption of dangerousness continues unabated").

[5] Somehow, the Superior Court, after reading the decision, unreasonably decided that given the Board's discretion, a Deputy Commissioner's suggestive statement to the effect that, "I'm going to make a suggestion, I'm not saying you have to do this…I'm going to suggest you might want to do some self-reading…I'm not saying you have to do that…" (Exh. A, pp. 55:13-56:14) constitutes evidence supporting parole denial. (See Exh. F, p. 2.)

(2000) 80 Cal.4th 409, fn. 7 at 419-420; In re Smith (2003) 114 Cal.Ap.4th 343, 365-366), or that he would not necessarily have committed the crime in a more aggravated manner then that ordinarily shown in a conspiracy to commit murder offense. (In re Scott (2004) 199 Cal.App.4th 871, 891 [Review denied].) Additionally, an especially callous crime must have involved acts of "gratuitous" cruelty such as those reflected by the offense events in In re Van Houten (2004) 6 Cal.App.4th 339, 351, acts which far exceed the minimum necessary to kill. Not only was the victim in this case neither killed nor injured, and thus could not have suffered from prolonged tortuous infliction of pain, there is absolutely "no evidence" such was the intention of the conspirators.

9. The Board panel finding that the parole denial was supported because the "motive was inexplicable and very trivial in relation to the offense," followed by their list of motives for the…crime, is illogical and obviously contrary to fact. Facts which show Petitioner's motivation for the crime was his desire to recoup the unpaid $1.1 million. While it was carried out in an illegal manner, it was certainly not an inexplicable or trivial motive, as the Board effectively noted on p. 52:16-17 of Exh. A.

10. As recognized in the considered evidence, Petitioner's impulse to commit the crime resulted in part from his 1989 anger over the intended victim's refusal to repay the $1.1 million owed to the company Petitioner and his partners managed and controlled. (See e.g. Exh. E, April 16, 2005, psychological evaluation, page two, Review of Life Crime.) Numerous case decisions hold that an offense motivated by anger, revenge, jealousy, etc. cannot be considered either dispassionate or cold blooded, contrary to the Board's (Exh. A, p. 51:20-24) declaration otherwise. (See Arave v. Creech (1993) 507 U.S. 463, 472; In re Gray (2007) 151 Cal.App.4th 379, 406-407; In re Weider (2006) 146 Cal.App.4th 570, 588.) These last two cases directly address the Board's misapplication of the Cal. Code Regs., tit. 15 § 2402(c)(1)(B) dispassionate factor, when the offense (in part) was motivated by anger. Arave similarly defines permissible application of cold-blooded to characterize crime facts.

11. All conspiracies to murder, regardless of their target offense degree, are at a minimum a premeditated and/or intended offense, i.e. a calculated or planned offense. (See People v. Cortez (1998) 12 Cal.4th 1226, 1233.) Even the Board itself held, "[T]he offense was a situation where the crime was a planned crime, conspiracy with another person to murder the victim." Accordingly, these

elements which are minimally necessary to sustain a conviction for conspiracy to murder cannot support a parole denial decision under the standard of In re Rosenkrantz (2002) 29 Cal.4th 616, 683. Further, unless a conspiracy's plan to murder involves the intent to inflict prolonged torturous pain, not present in this case, it is simply not more cold-blooded than any other conspiracy to murder plan, precluding use of this reasoning to deny parole. To permit otherwise, for an ordinary plan to murder, would permit the Board to so characterize any conspiracy to murder and thus to blanket deny parole to any prisoner having been convicted of conspiracy to murder, regardless of the years served in prison and despite their exemplary prison record.

12. At plea, the People stipulated the target offense of Petitioner's conspiracy to commit murder was second-degree [murder], which under then governing law reduced his sentence to 15 years to life rather than the originally contemplated 25 years to life. (Exh. C, plea transcript, p. 14:6-12.) As of his November 6, 2006, fifth appearance before the Board, Petitioner has been imprisoned in CDCR custody for over 15 years and repeatedly denied parole based solely on the crime. (Exh. A, p. 51:16-17.) Given his stable and crime free prior history, exemplary and disciplinary free prison record, and the lack of actual violence in a crime wherein the victim was neither injured or killed, "the parole Board's decision to deem [this] prisoner unsuitable for parole solely on the basis of his commitment offense [no longer] comports with due process, [as] the decision was made [after] th[is] inmate served the minimum number of years required by his sentence." (Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 665.)

13. In their decision, the Board noted, "In regards to the District Attorney's Office of Los Angeles County, they take opposition at this time." (Exh. A, p. 53:13-15.) At plea and sentencing the District Attorney promised to have no opposition to [Petitioner] being paroled…" (See Exh. C, plea transcript, p. 14:17-28; sentencing transcript, p. 10:23-27.) A commitment that prosecutor explained meant the deputy district attorney attending Petitioner's parole hearing "would not oppose [Petitioner's] release at the first available opportunity upon [i.e. during] consideration and after consideration by the Board of Prison Terms…" (Exh. C, sentencing transcript, p. 10:25-27.) The Board's notation of an opposition to parole confirms the attending district attorney's representation to the parole authorities was contrary to the prosecutor's express promise at time of plea.

14. At plea, the prosecutor promised their office would "represent" to the parole authorities the disposition of this case as represented in the record (Exh. C, plea transcripts), however, that office in the form of the appearing Deputy District Attorney made no representation of that nature, thereby failing to fulfill his office's express promise to represent, i.e. to advocate, the disposition of this case to the parole authority.

15. California law, as decided by the State Supreme Court, requires the court enforce all terms of a plea agreement without regard to their apparent value, while precluding a failure to enforce based on harmless error analysis. See People v. Mancheno (1982) 32 Cal.3d 855, 860, 187 Cal.Rptr. 441, holding that, "Constitutional due process is implicated by a failure to implement a plea bargain according to its terms. For that reason [a] violation of a plea bargain is not subject to harmless error analysis." Also see People v. Walker (1991) 54 Cal.3d 1013, 1026, 1 Cal.Rptr.2d 902, 910, holding that, "It necessarily follows that violation of the plea bargain by an officer of the state raises a constitutional right some remedy. (Santabello, supra, 404 U.S. 259, 266-267, 30 L.Ed.2d 427, 435-436; People v. Calloway (1981) 29 Cal.3d 666, 668.)"

16. Denying parole relief in this case using application of the In re Dannenberg (2005) 34 Cal.4th 1061, 1098, minimally necessary to convict standard, to find Petitioner's offense circumstances were more than necessary to convict for conspiracy to commit a second-degree murder, would produce that In re Lee (2006) 143 Cal.App. 1400, 1413, "a absurd result" of punishing an offender solely because he accepted the State's supposedly beneficial offer to plead guilty to a lesser serious target offense, even though all parties were aware of the acts of the crime. An offer and stipulation by the People in this case of the offense type and target offense degree (Exh. C) which if used to deny parole would punish Petitioner by applying a more harsh standard than if he had been convicted of the conspiracy to commit first-degree murder target offense charge, originally contemplated. (Lee, Id.)

17. Petitioner appeared before the Parole Board and was found unsuitable for parole on November 6, 2006. That decision became final on March 6, 2007. On April 25, 2007, Petitioner's writ appealing that decision was filed in the State Superior Court (Case No. BH004628) and subsequently summarily denied on September 13, 2007. (See Exh. F.) On October 27, 2007, Petitioner filed his writ in the Appellate Court (Case No. B202907) which was similarly denied on

December 7, 2007. (Exh. H.)[6] A Petition for Review, Case No. S159107, was filed in the State Supreme Court on December 17, 2007. On that date the Supreme Court requested the Appellate Court record in this matter – which they received the following day. Accordingly, the record reviewed by the State Supreme Court included the writ filed in the Appellate Court, both lower court decisions, and the Petition for Review.

18. At each of Petitioner's prior hearings, after noting they accept the trial court's findings as true, the Board, as in this instance, failed to note in its decision why they found Petitioner would pose a threat to public safety, if released, contrary to the trial court which released Petitioner multiple times on post-conviction bail under their Penal Code § 1272.1 authority, which statute required release be denied if the court determined an offender would pose a threat to society, or to any person, based in part on a court examination of the seriousness and facts of the offender's crimes.

19. Petitioner's exemplary prison record gives a clear appearance of rehabilitation.

20. No relevant evidence concerning his 18+ year old offense circumstances or any other matter was considered by the Board which demonstrates Petitioner currently poses a threat to public safety if released. (In re Lee, supra, 143 Cal.4th at 1408.)

**PRAYER**

WHEREFORE, PETITIONER requests this court:

1. Issue an Order to Show Cause requiring the state to show how in accordance with fact and governing law Petitioner's record shows he is currently a threat to public safety and why Petitoner should not obtain relief given the District Attorney's failure to provide him benefits expressly promised at plea;

2. After consideration, grant relief by ordering Petitioner's release or by vacating the parole denial in this case, instructing the Board hold a new hearing within 45 days at which they comport with due process by finding that neither Petitioner's prior history, nor his exemplary prison record, nor his almost 19 year old conspiracy to commit a second-degree murder, without victim injury or death, provide a factual basis supporting parole denial, and accordingly set his term and release him; and

3. Find that the District Attorney's office failed to not oppose parole or represent the

---

[6] In its denial decision the Appellate Court relied on In re Dannenberg (2005) 34 Cal.4th to find 'some evidence' supports the decision, without noting the evidence, therefore, presumably concurring with the Superior Court decision . Oddly, that court also noted without clarification, but with reference to its previous decision that in Case No. B183409 (Exh. 1), that Petitioner raised an argument rejected in a previous petition. To the extent the court is referring to his appeal of the Board's decision, Petitioner simply has the due process right to appeal each Board decision. However, to the extent the Appellate Court was referring to Petitioner's claims vis-à-vis the terms of his plead agreement, in this writ Petitioner raised none of the issues rejected by the Appellate Court in its 2005 decision.

disposition of this case to the parole authorities, and accordingly compel specific performance of Petitioner's plea agreement.

Dated: February 27, 2008

Respectfully submitted,

Clifford Brodsky
Petitioner, In pro per

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This case arises from decisions made by the Board of Parole Hearings and state courts 18+ years after the occurrence of Petitioner's offense which conflict with the nature of that inchoate conspiracy to commit second-degree murder and this prisoner's exemplary prison record, lack of a prior record, and stable social history. It results from the Board's fifth decision to deny parole which was unsupported by any reliable evidence showing that Petitioner remains/would currently pose an unreasonable risk to society if released, as the nature and facts of Petitioner's now almost 19 year old offense no longer predict his potential for re-offending, given his disciplinary free and otherwise highly positive prison programming record, his pre-offense spotless history, and Board requested psychological evaluations finding no further need for self-help, no precursors for violence, a prisoner better suited for parole than almost every other inmate, etc. This is also a case where the Deputy District Attorney failed to honor a prosecutor's express promise made at time of plea that their office would not oppose parole and that a representative from their office would appear and "represent" to the parole authority the "disposition" of this case as "represented in the record." A disposition including the "People's" express stipulation that the commitment offence in this case is a conspiracy to commit a second-degree murder carrying a 15 years to life sentence, the District Attorney's promise to not oppose Petitioner's release upon and after the earliest consideration, and the prosecutor and trial court's releasing Petitioner on unmonitored and unrestricted post-conviction and post-sentencing bail after arranging for his later self-surrender to the Department of Corrections. Releases and a self-surrender that could not have occurred unless Petitioner was found by the judiciary not to be a threat to society or to any person, as mandated by California Penal Code § 1272.1.

## LEGAL ARGUMENT

### I. THE BOARD VIOLATES DUE PROCESS AND DEPRIVES AN APPEARING PRISONER OF THEIR FEDERALLY PROTECTED LIBERTY INTEREST BY IGNORING THE LESSER SERIOUS NATURE OF A COMMITMENT OFFENSE AND BY REPEATEDLY RELYING ON THE PREDICTIVE VALUE OF THE UNCHANGING FACTORS OF THE CRIME.

Both state and federal courts have found Penal Code "Section 3041 [, subd. (b)] creates in every inmate a cognizable liberty in parole which is protected by the safeguards of the Due Process Clause," holding that interest arises "upon the incarceration of the inmate." (Biggs v. Terhune (9th Cir. 2003) 910, 914-915, relying on McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-902.) Accordingly, numerous courts have repeatedly held that even in cases where offense circumstances support parole denial under regulatory law, due process precludes the crime alone justifying repeated parole denials in the face of a prisoner's long-term exemplary type prison record demonstrating rehabilitation. (See e.g. In re Lawrence[7] (2007) 150 Cal.App.4th 1511, 1540; Biggs v. Terhune, 334 F.3d at 916-917; In re Scott (2005) 34 Cal.Rptr.3d 905, 919-920; In re Lee (2006) 143 Cal.App.4th 1400, 1412.) This Petitioner has been denied parole five times based solely on the unchanging circumstances of his offense. A decision this Board panel accompanied with their notation Petitioner's Psychological Evaluation results are supportive of his being released. Further, as the Board noted, Petitioner has no criminal history other than his commitment offense, and prior to imprisonment he had a very stable social history resulting in his now having strong community and family support expressed in the form of letters of support and strong parole plans. In prison, again as the Board noted, Petitioner has remained disciplinary free, completed two CDC Vocational programs (Mechanical Drawing/Computer Aided Design and Textiles) and completed a private college para-legal course and other educational courses including multiple accounting courses, and has positively worked at assignments as a Teacher's Aide in Vocational and Academic areas, Library Clerk, Program Office Clerk, etc.

In In re Lee 143 Cal.App.4th at 1412, the court addressed this issue, holding, "Simply from the passing of time [a] crime [ ], [which occurred] almost 20 years ago ha[s] lost much of [its] usefulness in foreseeing the likelihood of future offenses than if [a prisoner] had committed them five or ten year

[7] The State Supreme Court granted review in In re Lawrence, Case No. S154018, on September 19, 2007, to answer the questions, "[T]o what extent should the Board of Parole Hearings, under Penal Code section 3041...consider the prisoner's current dangerousness and at what point, if any, is the gravity of the commitment offense and prior criminality insufficient to deny parole hen the prisoner appears otherwise rehabilitated." However, the State Supreme Court, in a 5 to 2 vote, also lifted the stay and released petitioner Lawrence. Further, the State Supreme Court has granted review, or an O.S.C., and returned cases to lower courts, instructing they determine why petitioner remains a danger to public safety, citing In re Lee (2006) 143 Cal.App.4th 1400, 1408, in those orders. See e.g. In re Ronald Singler, (2007) DJDAR 5850, Case No, S150139; In re Masoner (2007) DJDAR 12435, Case No. S144097.)

ago[,]" relying on "In re Scott (2005) 133 Cal.App.4th 573, 595, "past crimes value for predicting future crimes diminished over time." (Lee, Ibid.)[8] The parole matter in question in Lee and the Board hearing results being appealed in this matter occurred 17 years following the parties arrest for committing their respective offenses, while similarly both crimes occurred as a result of an angry response to a victim who refused to make installment payments on a large business loan, in the Lee matter one victim was killed and the other survived after being shot twice. (Lee at 1404.) In Petitioner's case, the intended victim was neither injured nor killed. Both Lee and Petitioner "had no prior criminal history [and] acknowledged [their] guilt by entering into a plea bargain that sent [them] to prison for 1[5] years to life." Lee at 1406.) Further both have "had a spotless prison discipline record" with Lee having had one minor violation for smoking in 1998," and Petitioner having had no violations. Both Lee and this Petitioner "improve[d themselves] by taking education[al] classes [in prison.]" (Lee, Id.) Further, "Every prison psychologist [who] evaluat[ed Lee or this Petitioner] found [both] posed little or no danger to public safety if released." (Lee at 1406.) While recognizing the seriousness of his offense, given his disciplinary free and overall very positive prison programming record, as recognized by all the experts, as in the Lee case, after 17+ years, the nature of this Petitioner's offense has lost all of its usefulness as a predictor of the likelihood of his committing future crimes. (Lee at 1412.)

Not only was the ability of the Board to predict this Petitioner's future dangerousness based simply on the circumstances of his then 17+ year old commitment offense now nil, as held by In re Scott, supra, 133 Cal.App.4th at 595, 34 Cal.3d 905, "The commitment offense can negate suitability only if the circumstances of the crime reliably established by evidence in the record rationally indicate

---

[8] As noted in fn. 3, these state case decisions (and others of a similar nature) were adapted as a federal standard by the Ninth Circuit in Hayward v. Marshal, 2008 U.S. App.LEXIS 40. Hayward at *26-*27 also relied on Rosenkrantz v. Marshall (C.D. 2006) 444 F.Supp.2d 1063, 1084 ("while relying upon petitioner's crime as an indicator for his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances – after nearly two decades of incarceration and half a dozen parole suitability hearings – violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.") "The facts of this petitioner's offense shows a crime far less violent then the execution style murder in Rosenkrantz, accordingly requiring a lesser time period since the crime, for its facts to loose their predictive value, given an exemplary prisoner record. At his parole hearing it had been over 17 years since Petitioner committed his crime and over 15 years since he surrendered from a crime free bail to begin serving his sentence, which time period he respectfully submits renders nil the predictive value of his crime facts.

the offender will present an unreasonable public safety risk if released from prison. Yet the predictive value of the commitment offense may be very questionable after a long period of time." (Id., at 922.) "Therefore, an unsuitability determination must be predicated on 'some evidence that the particular circumstances of [the prisoner's] crime – circumstances beyond the minimum elements of his conviction – indicated exceptional callousness and cruelty with trivial provocation, and thus suggests he remain a danger to public safety.' (In re Dannenberg, supra, 34 Cal.4th at 1098.)" (Id., at 922.) "The record [before the Board] did not provide 'a scintilla of evidence' [Petitioner] committed his offense 'in such a manner.

Further, the facts in the record and governing case law are contrary to the court's characterization of the motive in this case as being trivial. See In re Scott (2004) 119 Cal.App.4th 871, 894, fn. 13, wherein the court identified that "Murdering someone for 40 cents was certainly … very trivial in relationship to the offense," a sum and standard significantly less than the $1,000,000.00 at stake herein. Scott also noted that "to fit the regulatory description, the motive must be materially less significant (or 'more trivial') than those that which conventionally drive people to commit the offense in question and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinary, belying the State's claim otherwise. Additionally, unsupported is the Superior Court's finding Petitioner was denied parole due to a need for additional self-help. The Board found precisely the opposite, commending Petitioner for his self-help participation, noted he had done quite a bit, and should continue on his course. They did not deny parole because Petitioner needed to prepare book reports, or even require such actions.

## II. APPLICATION OF THE MINIMALLY NECESSARY TO CONVICT STANDARD EFFECTED BY COMPARING ACTUAL OFFENSE FACTUAL ELEMENTS VERSUS THOSE LEGALLY ASSOCIATED WITH A PLED TO LESSER TARGET OFFENSE PRODUCES "ABSURD RESULTS" CONFLICTING WITH OWED DUE PROCESS.

Disregarding that the factual elements underlying Petitioner's target crime were of a planned, i.e. premeditated, nature, the trial court approved the People's stipulation the target offense was the lesser conspiracy to commit an [unpremeditated] second-degree murder. However, the target offense in this case was never effected. Reducing the target offense in this case had the sole effect and benefit

to Petitioner of reducing his minimum term to 15 years of imprisonment. Petitioner was, however, still convicted of committing a Penal Code § 182, conspiracy to murder. Determining whether or not there were degrees of conspiracy to murder, the State Supreme Court held that:

> "Consequently, it logically follows that where two or more persons conspire to commit murder – i.e. intend to agree or conspire, [and] further intend to commit the target offense of murder and perform one or more overt acts in furtherance of the planned murder – each has acted with a state of mind 'functionally indistinguishable from the mental state of premeditating the target offense of murder.' ([People v.] Swain, supra, 12 Cal.4th [893,] 608-609.) [Accordingly,] [t]he mental state required for convicting of conspiracy to commit murder necessarily establishes premeditation and deliberation of the target offense of murder – (People v. Cortez (1998) 12 Cal.4th 1226, 1233.)

Disregarding that all conspiracy to murder offenses are at a minimum "premeditated" crimes, the Board denied parole finding Petitioner's crime was planned, i.e. premeditated, effectively disregarding the greater than minimally necessary actual elements required to convict test to deny parole. (See In re Rosenkrantz (2002) 29 Cal.4th 616, 683; In re Dannenberg (2005) 34 Cal.4th 1061, 1071.) However, if that test is applied to a never carried out second-degree murder target offense, it will always provide support for parole denial when the Petitioner pled guilty to the lesser degree crime expressly stipulated by the People. But, would not apply if a Petitioner had been convicted of the higher degree crime, thus producing the "absurd results" noted in Lee at 1413, effectively punishing only those who plea by using a harsher standard for testing their case facts than for those convicted by trial. The court in Lee at 1412-1413 rejected this absurd result and held that the minimally necessary standard must be applied to the offense and degree originally contemplated pre-plea, and by that standard found Lee's acts were not more than the minimum necessary for his offense and thus unavailable to support parole denial. The state appealed to the State Supreme Court which denied review, thus sustaining the appellate court decision.

## III. PLEA AGREEMENTS AND STIPULATIONS ARE CONTRACTUAL AGREEMENTS GOVERNED BY CONTRACT LAW STANDARDS.

Plea bargains and stipulations in California are contractual in nature and interpreted according to contract law principles. (People v. Shelton (2006) 37 Cal.4th 759, 767; Wooley v. Turkus (1958) 51 Cal.2d 408.) To construe the terms of a plea and/or stipulations, courts look to the express language

of the agreement, then give consideration to the law underlying an agreement. See Alpha Beta Food Mkts. Inc. v. Retail Clerks (1955) 45 Cal.2d 764, 771, holding that under California law all applicable laws in existence when an agreement is made necessarily enter such contract and form part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated into its terms. Similarly holding, Farmers Bank v. Fed. Reserve Bank, (1922) 262 U.S. 638 660. Under existing law at the time of plea, as noted ante in paragraph 15 of the Statement of Facts, harmless error analysis may not be applied to failures to enforce terms of a plea when violated, requiring some remedy be provided for any violation.

**IV. THE DISTRICT ATTORNEY'S INTENTIONAL FAILURE TO REPRESENT THE DISPOSITION OF THIS CASE TO THE BOARD AS PROMISED AT PLEA, VIOLATED THE TERMS OF THAT CONTRACT.**

At time of plea, the prosecutor detailed the disposition of this case. Included among those details were the People's stipulation of the target offense type and degree and the prosecutor's promise his office would have no opposition to the Petitioner's release at the first date the Board determines him to be suitable. He had also pledged that, "some years hence when a district attorney attends that lifer hearing, that this disposition as represented by the record is known and can be represented to the appropriate authorities at that time." (Exh. C, Plea Transcript, p. 14.)

Disposition" means the nature, the character, the outlook of the agreement, while "represent" means to stand for, to symbolize, to embody that disposition. However, instead of representing this disposition (outlook) to the authority, the attending Deputy District Attorney elected to sit silent on this matter throughout the hearing. That silence did not represent the nature, the disposition, of the agreement. A violation by the government of an express term of a plea renders the defendant's acceptance of that agreement involuntary, requiring specific performance be ordered in a manner beneficial to the aggrieved party, without any need to show prejudice. See People v. Mancheno (1982) 32 Cal.3d 855, 865, directly addressing this issue holding, "[T]he harmless error test is inapplicable to a situation involving failure to fulfill the terms of a plea bargain. Defendant's entitlement to the benefit of his bargain cannot be predicated on some measurable detriment. Because a Court can only speculate when a defendant would negotiate for a particular term of a bargain, implementation should

not be contingent on other's assessment of the value of the term to defendant." Also see Gunn v. Ignacio (9th Cir. 2001) 263 F.3d 965, 970. Further, "When the government agrees … to make re[presentation] with respect to a [disposition], it must carry out its part of the bargain by making the promised re[presentation]" (United States v. Benchimol (1985) 471 U.S. 453, 456, 105 S.Ct. 2103, 2105, 85 L.Ed.2d 462), else those failures, as in this case, will render acceptance of a plea involuntary, as it will have been entered into under false premises. (Maybry v. Johnson (1984) 467 U.S. 504, 509.)

**CONCLUSION**

The underlying basis for the state's decision to deny Petitioner parole disregarded the years passed since the crime occurred and his exemplary prison record, were otherwise factually unsupported or contrary to law, thus arbitrary. Further, as explicitly stated by the Board, the District Attorney, contrary to their promise at time of plea, opposed parole, rendering Petitioner's acceptance of that agreement involuntary. Petitioner, therefore, respectfully requests his writ be granted.

Exhibit "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life Term Parole Consideration Hearing of: )

CLIFFORD BRODSKY )

CDC Number H-07665

INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 6, 2006

12:56 P.M.

PANEL PRESENT:

Edward Martinez, PRESIDING COMMISSIONER MARTINEZ
Joseph Muga, Deputy Commissioner

OTHERS PRESENT:

Clifford Brodsky, Inmate
Attorney for Inmate
Stephen Defilippis, Deputy District Attorney
Victim
Wife of Victim
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes

See Review of Hearing Transcript Memorandum

INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 10 |
| Pre-Commitment Factors | 10 |
| Post-Commitment Factors | 27 |
| Parole Plans | 32 |
| Closing Statements | 36 |
| Recess | 49 |
| Decision | 50 |
| Adjournment | 58 |
| Transcriber Certification | 59 |

--oOo--

**P R O C E E D I N G S**

**PRESIDING COMMISSIONER MARTINEZ:** Today's date is November the 6th of 2006. The time is 12:56 p.m. We are located at CTF Soledad. The inmate was received on August 30th of 1991 from Los Angeles County. The life term began on August 30th of 1991. The minimum eligible parole date is August 15th of 2001. The controlling offense for which the inmate has been committed is conspiracy to commit murder in the second degree under case number A, Adam 000576, Count 1 under Penal Code Section 187. The inmate received a term of 15 years to life. This hearing is being tape recorded, and for the purposes of voice identification, each spelling our last name, when it comes to you, your CDC number. I'm going to start with myself (inaudible).

**INMATE BRODSKY:** Triple CMS is a program or receiving psychological help or (inaudible) medicine, and EOP is extended outpatient program.

**PRESIDING COMMISSIONER MARTINEZ:** All right. (Inaudible).

**INMATE BRODSKY:** No.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**INMATE BRODSKY:** No.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**INMATE BRODSKY:** (Inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible) suffer from any disability that would prevent you from Participating in today's hearing?

**INMATE BRODSKY:** No.

**PRESIDING COMMISSIONER MARTINEZ:** Okay. Counsel, have we met all of Mr. Brodsky's ADA rights?

**ATTORNEY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** Move forward. This hearing is being conducted pursuant to Penal Code Sections 3041 and 3042 and the rules and regulations of the Board of Prison Terms governing Parole Consideration Hearings for life inmates. The purpose of today's hearing is to once again to consider the number and the nature of the crimes that you were committed for, your prior criminal, your social history, and your behavior and programming since your commitment. We've had the opportunity to review your Central File and your prior transcript, and you will be given the opportunity to correct or clarify that record. We will reach a decision today and inform you whether or not we find you

suitable for parole and the reasons for our decision. If you are found suitable for parole, the length of your confinement will be explained to you. Again, nothing that happens here today will change the findings of the court. The Panel is not here to retry your case. The Panel is here for the sole purpose of determining your suitability for parole. Do you understand that, Mr. Brodsky?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** The Panel, again, this hearing is going to be conducted in two phases. I will discuss with us the crime for which you were committed for, your prior criminal and social history. Commissioner Muga is going to discuss with you your progress since your commitment, your counselor's reports, your psychological evaluation and your parole plans as well as any letters of support that you may have and also letters of opposition that may appear. (Inaudible) and your attorney will be given the opportunity to ask you questions. Questions from the District Attorney shall be asked through the chair, and you will direct your answers to the Panel. Next, the District Attorney then your attorney will be given an opportunity to give a final closing statement

regarding your parole suitability. Your statement should address why you feel you are suitable for parole. (Inaudible) and we'll then also have an opportunity to give a statement regarding the crime and the responsibility. The Panel will then recess, clear the room, deliberate, and once the deliberations are completed, the Panel will resume the hearing and announce its decision. The California Code of Regulations states that regardless of time served, the life inmate shall be found unsuitable for and denied parole if, in the judgment of the Panel, the inmate would pose an unreasonable risk of danger to society if released from prison. You have certain rights, and those rights include the timely notice of this hearing, the right to review your Central File, and the right to present relevant documents. Counsel, have those rights been met?

**ATTORNEY:** Yes, they have.

**PRESIDING COMMISSIONER MARTINEZ:** All right. You have an additional right to be heard by an impartial Panel, Mr. Brodsky. Do you have any objections to the Panel that sits before you here today?

**INMATE BRODSKY:** No.

**PRESIDING COMMISSIONER MARTINEZ:** Counsel?

**ATTORNEY:** No.

**PRESIDING COMMISSIONER MARTINEZ:** You will receive a written copy of our tentative decision today, and that decision becomes effective within 120 days. A copy of that decision and a copy of the transcript will be sent to you. Now, the Board has eliminated its appeal process. So, therefore, if you disagree with anything in today's hearing, you have the right to go directly to the court with your complaint. I'd also like to note that you are not required to admit your offense or discuss your offense today. However, the Panel does accept the findings of the court to be true. Do you understand that, Mr. Brodsky?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** All right. Commissioner Muga, will there be any confidential material used today?

**DEPUTY COMMISSIONER MUGA:** No, there will be not be.

**PRESIDING COMMISSIONER MARTINEZ:** All right. I'm going to go ahead and pass the checklist, make sure that we're operating on the same documents. Counsel?

**ATTORNEY:** Although I'm seeing that there appears to be another document. Is there an

update?

**PRESIDING COMMISSIONER MARTINEZ:** Yeah, there is (inaudible).

**ATTORNEY:** I have not received it.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**ATTORNEY:** There's nothing over here. Now, did you get one of these?

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** No, I did not.

**ATTORNEY:** LAPD? Thank you.

**PRESIDING COMMISSIONER MARTINEZ:** Do you have the recent psych?

**ATTORNEY:** I have the recent psych report.

**PRESIDING COMMISSIONER MARTINEZ:** Yes.

**DEPUTY COMMISSIONER MUGA:** (Inaudible).

**ATTORNEY:** Yeah.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And I have everything on the checklist.

**PRESIDING COMMISSIONER MARTINEZ:** All right. We'll mark that Exhibit 1. Will there be any additional documents, Counsel, submitted?

**ATTORNEY:** The only one that potentially may not have reached his C-File was an October 5 Cage Your Rage chrono.

**DEPUTY COMMISSIONER MUGA:** I have it. (Inaudible).

**ATTORNEY:** You have it? Then the documents (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** Okay. Good. All right. Any preliminary objections, sir?

**ATTORNEY:** Yes. I object to the letter from the Los Angeles Police Department on several grounds.

**PRESIDING COMMISSIONER MARTINEZ:** Are you going to list your grounds, sir?

**ATTORNEY:** Yes. I thought you were discussing (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** Go ahead.

**ATTORNEY:** The letter appears to be dated October 13th, 2006. I've been Mr. Brodsky's attorney of record since prior to the September 2002 hearing and the Board has been aware of my role. This was not provided to me. It certainly was not in the lifer hearing packet provided by the institution. Furthermore, the Los Angeles Police Department was the investigating agency for the District Attorney office. The District Attorney office entered into a stipulation regarding the nature of this offense and entered into an agreement whereby they would not oppose parole at the earliest possible time. This

document from the Los Angeles Police Department as the investigating agency for the District Attorney's office violates that (inaudible) so I would object to its consideration and it certainly violates the ten-day rule regarding providing documents (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** I know that was addressed last year, the issue regarding this letter, and there was a letter from the Los Angeles Police Department that was submitted last year in the 2005 (inaudible) 2005 hearing, and comments on that was that the Los Angeles Police Department were not bound by anything that the District Attorney's office in Los Angeles, any agreements or anything like that were made, but they're not bound by that, and, again, based on the fact (inaudible).

**ATTORNEY:** And I would just note for the record that the last year's position regarding admissibility of the letter for that hearing, you know, certainly is not binding on this Panel. This is the investigating agency for the District Attorney's office. They are certainly bound by the representation (inaudible) this was an express stipulation and an express term of the plea agreement, and if nothing else, it violates the spirit of the agreement by attempting to

undermine the agreement by having your investigator oppose parole when you can't do that. You being the District Attorney's office. The District Attorney's office and dealing (inaudible) opposing parole by having the investigating agencies do what they have been contractually precluded from doing, so I would consider that a violation of the plea agreement. The plea agreement, of course, does bind the entire state of California. This was a stipulation that was entered into by the District Attorney on behalf of the people of the state of California, and as a result under all the relevant authorities (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible) all right. Will Mr. Brodsky be speaking to the Panel today, sir?

**ATTORNEY:** He will be speaking with the Panel. However, he will not be discussing the commitment offense. And, again, opposition is that the commitment offense, the facts and circumstances of that have been established by the stipulation entered into between Mr. Brodsky and the District Attorney's office that was agreed to by the court, and we expect that stipulation to (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** All

right. In this case, Mr. Brodsky, please raise your right hand. Do you solemnly swear or affirm that the testimony you will give at this hearing will the truth and nothing but the truth?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** Thank you very much. Counsel, no objections again, I'm going to incorporate the statement of facts referenced, incorporate them again. (Inaudible) regarding the use of the probation officer's report as well as the appellant decision, so rather than go through all of that again, I'm going to basically (inaudible) incorporate by reference in regards to the statement of facts. However, I will enter the prisoner version (inaudible) and I'm taking that from the November 2000 --

**ATTORNEY:** There is just -- and just for the record, I do have the same objections regarding reading in the statement of facts that I had at last year's hearing. I won't restate those since (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** Very well (inaudible) overrule the (inaudible) and, in regards to just going through entering the prisoner's and just so you're aware, again, you have the August 2006 calendar Board, and it is

referenced to the November 2004 calendar in regards to the prisoner's version (inaudible). Mr. Brodsky admitted guilt (inaudible) remorse. He stated I should have stopped it quote end quote. (Inaudible) let's talk about your personal history, Mr. Brodsky. It states here that you were born in New Jersey on August 13th of 1943 and that you came to California from Florida in 1965. You resided in Los Angeles after being stationed in Long Beach with the United States Navy. At the time of your arrest, you were residing with your daughter part-time and your (inaudible) part-time. And that you were married in 1969 to -- help me out with that name -- Maureen.

**INMATE BRODSKY:** Maureen.

**PRESIDING COMMISSIONER MARTINEZ:** Maureen?

**ATTORNEY:** I think that's a typo.

**PRESIDING COMMISSIONER MARTINEZ:** So it's Maureen. Okay. Thank you. McLaughlin. (Inaudible) you divorced in 1980, and (inaudible) irreconcilable differences, and you have one daughter (inaudible) you then married Maria Isaac in 1991, and you have a son from this union. You graduated from high school at the age of 17. At the age of 21, you graduated from Penn State with a Bachelor of Science degree in physical

education. And this is you, is that correct? Or is this is about your son.

**INMATE BRODSKY:** That's me.

**PRESIDING COMMISSIONER MARTINEZ:** This is you. Okay. Because it kind of sounds like we're talking about your son. So you graduated from Penn State; is that correct?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** Okay. With a Bachelor of Science degree, history education. You earned your master's degree in administration from Cal State Dominguez Hills at the age of 37 years old. You're employed as a vice president for BBL Sewing California, Incorporated, at the time of his arrest. He admittedly had started drinking beer at the age of 18, but your only (inaudible) other than alcoholic beverages. You never experimented with controlled substances, and you have no history of physical, mental, or emotional health problems. So, with that, in regards to your family, let's go there. Your daughter is how old now?

**INMATE BRODSKY:** 34 years old.

**PRESIDING COMMISSIONER MARTINEZ:** 34 years old? And where does she live?

**INMATE BRODSKY:** She lives in Torrance, California.

**PRESIDING COMMISSIONER MARTINEZ:** In Torrance. Is she married?

**INMATE BRODSKY:** She's married and has a daughter.

**PRESIDING COMMISSIONER MARTINEZ:** Do you keep in touch with her? Does she come to visit you?

**INMATE BRODSKY:** (Inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** Okay. And what about your son?

**INMATE BRODSKY:** (Inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** And where is he at in --

**INMATE BRODSKY:** He and his mother live in Los Angeles County (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**INMATE BRODSKY:** (Inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** Okay. Now, are you still involved with your fiancée or are you married now? Is she wife your now? You're married now?

**INMATE BRODSKY:** Yes, we're married.

**PRESIDING COMMISSIONER MARTINEZ:** And your wife is -- who are we talking about?

**INMATE BRODSKY:** Maria. Maria Isaac.

**PRESIDING COMMISSIONER MARTINEZ:** We're

talking about Maria Isaac. You were married in 1991?

**INMATE BRODSKY:** Right.

**PRESIDING COMMISSIONER MARTINEZ:** That marriage is still intact; is that correct?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** And where does she live?

**INMATE BRODSKY:** In Canyon Country.

**PRESIDING COMMISSIONER MARTINEZ:** Canyon Country?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** And where is that in respect to the LA area?

**INMATE BRODSKY:** It's -- I don't know if you know Los Angeles or not, but it's up -- it's off the 5 to the 14 freeway, and then you go north, and it's about half way to Palmdale.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible) and what does your wife do?

**INMATE BRODSKY:** (Inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** She's still employed?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** Okay. Military background, how long were you in the navy?

**INMATE BRODSKY:** (Inaudible) four years.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**INMATE BRODSKY:** I completed my college and I finished my academics and I --

**PRESIDING COMMISSIONER MARTINEZ:** This was an honorable discharge?

**INMATE BRODSKY:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** While in the navy in the military, did you have any problems, any problems at all?

**INMATE BRODSKY:** No.

**PRESIDING COMMISSIONER MARTINEZ:** No. It indicates that educationally your (inaudible) how about as far as growing up in Jersey, in New Jersey, how would you describe your home life?

**INMATE BRODSKY:** (Inaudible) my home life was fine.

**PRESIDING COMMISSIONER MARTINEZ:** You grew up in Philadelphia? I'm sorry. It indicates you were born in New Jersey, but you grew up in Philadelphia and then in Florida.

**INMATE BRODSKY:** (Inaudible) Florida (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** What kind of family life did you have?

**INMATE BRODSKY:** It was a fine family.

**PRESIDING COMMISSIONER MARTINEZ:** Your father, what did he do?

**INMATE BRODSKY:** My father (inaudible) in the navy, chief petty officer.

**PRESIDING COMMISSIONER MARTINEZ:** What about your mother?

**INMATE BRODSKY:** She stayed at home.

**PRESIDING COMMISSIONER MARTINEZ:** Did you have any siblings?

**INMATE BRODSKY:** One sister. (Inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible) solid?

**INMATE BRODSKY:** Yup.

**PRESIDING COMMISSIONER MARTINEZ:** No problem?

**INMATE BRODSKY:** No.

**PRESIDING COMMISSIONER MARTINEZ:** Okay. You indicated no real problems with alcohol, drugs, or anything like that growing up or even in your later years?

**INMATE BRODSKY:** None at all.

**PRESIDING COMMISSIONER MARTINEZ:** Okay. Is there anything, Mr. Brodsky, that you'd like to add to the record regarding your personal history? That you'd like to share?

**INMATE BRODSKY:** No (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** Does

that about cover everything?

**INMATE BRODSKY:** (Inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** All right. Now, Commissioner Muga's going to be addressing your parole plans, and letters and so forth, but I show here that you plan to reside with your daughter or is that --

**INMATE BRODSKY:** Yes (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** What's the situation with your current wife then?

**INMATE BRODSKY:** I've just been here for a long time (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** And this is okay with your wife?

**INMATE BRODSKY:** Yeah.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**INMATE BRODSKY:** Yes (inaudible) and my daughter and I have always been close, and it's (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** All right. Very well. I'll turn it over to Commissioner Muga to discuss your post-conviction (inaudible).

**DEPUTY COMMISSIONER MUGA:** I have just some minor questions. Who's in the home there with your daughter?

**INMATE BRODSKY:** With who? My daughter?

**DEPUTY COMMISSIONER MUGA:** Yeah. Who lives there?

**INMATE BRODSKY:** Her husband and daughter.

**DEPUTY COMMISSIONER MUGA:** Okay. If I recall, is it her two-year-old daughter.

**INMATE BRODSKY:** Her daughter? My granddaughter?

**DEPUTY COMMISSIONER MUGA:** Yeah.

**INMATE BRODSKY:** She'll be three in April.

**DEPUTY COMMISSIONER MUGA:** Okay. So it's a two- year-old daughter and her husband, and this is a single-family dwelling in Canyon Country you said?

**INMATE BRODSKY:** No. She lives in Torrance.

**DEPUTY COMMISSIONER MUGA:** Oh. I'm sorry. (Inaudible). So the plan would be, Plan A would be to live with your daughter. Is there a Plan B just in case something happens there and that falls through.

**INMATE BRODSKY:** I'd live with my wife.

**DEPUTY COMMISSIONER MUGA:** Okay. And she's the one that lives in Canyon Country?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Okay. And who's in that household right now?

**INMATE BRODSKY:** My wife and son. (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Plan A, Plan B. As far as work, what's your plan there.

**INMATE BRODSKY:** (Inaudible) sister-in-law who own a retail business.

**DEPUTY COMMISSIONER MUGA:** And that's the Sea Horse Apparel?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** Business in Venice.

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** What kind of store is that?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** On the boardwalk situation there in Venice or --

**INMATE BRODSKY:** (Inaudible) on the boardwalk.

**DEPUTY COMMISSIONER MUGA:** And what would you be doing there (inaudible)?

**INMATE BRODSKY:** Well (inaudible) clothing on the internet and also (inaudible).

**DEPUTY COMMISSIONER MUGA:** Going to your letters, I'll go over all of them, but I want to make sure there was (inaudible) and I saw there was a letter from your daughter actually, but I

just want to note it for the record today, Anastasia, right?.

**INMATE BRODSKY:** Anastasia

**DEPUTY COMMISSIONER MUGA:** Anastasia Hasara, is that her last name? H-A-R-A-S-A is her last name, and she has a letter dated July 1st of '06 stating that she is your 34-year-old daughter and she says I am a stay at home mother of a two year old, and I live in the Los Angeles area. We live in a two-bedroom home. I want my father to come and live with me in the Torrance area after his release. Your sister-in-law's name is what? The one (inaudible).

**INMATE BRODSKY:** Barbara (inaudible).

**DEPUTY COMMISSIONER MUGA:** Barbara (inaudible). She has a letter dated July 1st of '06, and she is writing and says I am the sister-in-law of Clifford Brodsky and known him for over 30 years. I will provide him with employment -- I'm sorry. I'll provide him with employment helping to operate my retail business, one which is very familiar and that is in an industry that he has had considerable previous business experience. Clifford is very close to all the members of his family and has a relationship with all of our members. He has helped many of us in the past in our lives. (Inaudible) you have Plan

A, how about a Plan B as far as work if for some reason that does not pan out?

**INMATE BRODSKY:** (Inaudible) it will pan out.

**DEPUTY COMMISSIONER MUGA:** If it doesn't, though, what would you do? Look for employment using your already earned skills?

**INMATE BRODSKY:** (Inaudible) me and my wife (inaudible).

**DEPUTY COMMISSIONER MUGA:** You feel pretty confident today?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** You have a solid plan and confident in your skills?

**INMATE BRODSKY:** Yes. (Inaudible).

**ATTORNEY:** I have his statement from social security indicating that at age 62, and he is age 63, $1109 a month. If he retired at 66, 1471, at age 70, 1942.

**DEPUTY COMMISSIONER MUGA:** 1100 a month?

**ATTORNEY:** 1109 a month currently and 1471 if he works until 66 and if he works until 70, 1942 a month.

**DEPUTY COMMISSIONER MUGA:** Regarding Barbara Duffy, what does she plan to pay you as far as salary is concerned?

**INMATE BRODSKY:** In all honesty

(inaudible).

**DEPUTY COMMISSIONER MUGA:** (Inaudible) that's up to you (inaudible) you should know as to what she's prepared to pay you and if it's going to be sufficient for you.

**INMATE BRODSKY:** Oh, it would be (inaudible) sufficient enough for me to take care of myself and (inaudible) that I do know, and I do know it (inaudible).

**DEPUTY COMMISSIONER MUGA:** All right, as -

**INMATE BRODSKY:** She would be more than happy (inaudible) I just wanted to do that.

**DEPUTY COMMISSIONER MUGA:** While I'm looking at these letters, let me just go through them. There's some other letters of support that I want to put on the record. There's a letter from a Maureen McLaughlin. She was your former wife, letter dated September 20th of '06. It's a general letter of support and how you have been a wonderful father she says for our daughter. Given guidance and direction her entire life. She writes, I and the rest of my family will provide him with any assistant and support necessary to ensure his smooth return to society. There's a letter from Mark McLaughlin, and that is your ex-wife's current husband?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** And that letters dated September 18th of '06. Again, a general letter of support. He writes that Maureen and I will actively assist his reintegration into free society by providing him with any assistance he will need. There's a letter from Andrew Hasara, and that is -- this is your daughter's husband. They are the ones offering you a place to live. They're a letter from a Nicholas Brodsky, he's your 17-year-old son, offering a general letter of support, saying that my father has demonstrated his changed attitude first by pleading guilty and thereafter by what he has done while in prison. There's a letter by a James Takioka (phonetic).

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Okay. That letter is dated September 11th of '06. She lives in Torrance, and right, she identifies herself as a friend of your daughters and has known you for a long time, and she writes upon his return to society, myself and the rest of his family and friends will provide him with any assistance and support necessary to ensure his safe return. A letter by another Lynn Takioka (phonetic), another friend of your daughter's states that she will help in your reintegration. A letter from -

- oh, Talka Hendrickson, another friend of your daughter's, a general letter of support. It says that she would provide help in any way possible. And then Francis Duffy, who is your brother-in-law. He actually lives in Maryland, a letter dated August 25th of '06, a general letter of support. A Paul Frankovich, a letter dated 17 August of '06. He lives in La Quinta, California. He says he's known you for over ten years, both personal friend and as family. A general letter of support. And Richard Nutting, August 16th of '06, the letter's dated. It says he's known you for over 30 years and is a close friend of the family, and he writes I will support Clifford upon his release in any way that I can, knowing that he does have the capabilities to being a well adjusted and successful person. And a letter by Joan Roberts in Redondo Beach, a letter dated August 16th of '06, a close friend of yours for over 30 years, also willing to support you in any way she can. And a letter by Rabbi Sommer, Jewish chaplain at Salinas Valley State Prison (inaudible) dated May 21st of '05.

**INMATE BRODSKY:** It's actually a typo. It should be '06. I don't know if you know him personally, but I believe they're a CC on it, but CC1 to a (inaudible) is not in that position

until '06.

**DEPUTY COMMISSIONER MUGA:** Yeah, I know (inaudible). But the rabbi is, again, a general letter of support. The last part of the letter reads, above all, Mr. Brodsky has expressed great remorse for his past (inaudible) and responsibility for his actions. There is little doubt that within the CDCR, he is a model inmate who appears to be de facto rehabilitated and has sustained an exemplary level of conduct. If paroled, I (inaudible) what a remarkable success (inaudible).

**ATTORNEY:** There's a few letters. Do you have the letter from Maria Isaac?

**DEPUTY COMMISSIONER MUGA:** That's what I was just going to ask if there's a letter from his wife. I don't think there's one in my file.

**ATTORNEY:** There's at least one (inaudible) two letters.

**DEPUTY COMMISSIONER MUGA:** A letter from Maria Isaac I-S-A-A-C, that lives in Canyon Country, California. That is your current wife?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** And mother of your 17-year-old son?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** Let me just

read, I have lived in the Los Angeles area for almost 40 years and have been professionally employed as a computer programmer for over 20 of those years, and I've known Cliff Brodsky for most of that time. I know that Cliff deeply regrets the offense he admits committing and that mental anguish has (inaudible) the victim's family and our family. He has accepted responsibility for his actions, repeatedly expressed remorse (inaudible) prosecutor (inaudible) given the nature of his offense as stipulated in a plea, his stellar prison record and prior crime free prior life, it is parenthesis close parenthesis (inaudible) close parenthesis, it is time for him to be released from prison and come home and me and all other members of his family will provide all of the necessary support to ensure his successful reintegration back into society. And a letter by Salwa Jasis, J-A-S-I-S, a letter dated August 30th of '06. This is your mother-in-law?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** In conclusion, I know Cliff will never commit another criminal offense. His only wish is to be able to timely return to his family and help provide for them. We will provide him the necessary support to

ensure his smooth return to be an on-hand parent and economically productive member of society. Okay. Anything else as far as parole plans, letters of support?

**INMATE BRODSKY:** No, nothing that I can (inaudible).

**DEPUTY COMMISSIONER MUGA:** Let me move on to your institutional programming up to this point. My focus is going to be since the last hearing. The last hearing was August 23rd of '05, as you know. If there's any other information, new information that hasn't been put in the C-File, let me know as we are doing this. Your current classification score is 19. Your custody level is Medium-A. Your current work status, I believe you are the captain's clerk. Is that still correct?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Okay. How, how long have you been doing that? Because I found in one file that (inaudible).

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** (Inaudible). Captain's clerk comes with a supervisor's rating, but it is documented that you had excellent work supervisor's rating, so you've been do it the last 22 months. As far as since the last

hearing, as far as academic programming, you haven't been involved in any kind of academic programs, have you?

**INMATE BRODSKY:** No, no academic programs.

**DEPUTY COMMISSIONER MUGA:** As far as vocation, have you been involved in any vocation program since your last hearing?

**INMATE BRODSKY:** No. (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Now, you did complete mechanical drafting.

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Okay. And then there was a paralegal course that you had, correspondence course that you had completed; is that correct?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Any other ones that you completed?

**INMATE BRODSKY:** I completed the vocational textile program 10 or 12 years ago.

**DEPUTY COMMISSIONER MUGA:** As far as self-help activity since the last hearing, there's a Cage Your Rage chrono dated 10/5 of '06 by Protestant chaplain Lindsay, L-I-N-D-S-A-Y, that is a 12-session program, anger management program?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** Correct. Okay. Have you completed it?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** There was a -- you were involved in the central facility veteran's self-help group which meets on a regular basis. There's a chrono dated 8/17/06 documenting that. Also a 6/9/06 chrono documenting participation in that group. You completed AA healing -- excuse me healing for the angry heart video series?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** In a chrono dated February 23rd of '06. You participated in a Jewish ritual practice?

**INMATE BRODSKY:** Yes.

**DEPUTY COMMISSIONER MUGA:** That's documented by Chaplin Sommer in a chrono dated 1/31 of '06. That's also a 12-week anger management course put on by the Muslim Development Center, which you completed in a chrono dated 11/19 of '05. Any other self-help activity that you've been involved in specifically since your last hearing.

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** (Inaudible) as far as your disciplinary history, I could not

find any documentation of any negative 128's or 115's, is that to the best of your recollection you don't have any write ups?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Before I move on to psych evaluation, let me read the excerpt from the notices, the 3042 notices of the LAPD that was referred to previously. In a letter dated October 13th of '06, Kyle Jackson, captain, J-A-C-K-S-O-N, commanding officer for robbery and homicide division, LAPD writes, I'm just going to read from his letter. It's two paragraphs. In 1989, Clifford Brodsky along with an accomplice hired a hit man to murder Mr. Brodsky's business partner. This was purely a murder for profit as Mr. Brodsky was the beneficiary of his partner's life insurance policy. Although Mr. Brodsky did not admit to the crime, the hit man did. Evidence included taped telephone conversations of Mr. Brodsky admitting involvement in other hits. The facts of this case clearly indicate that Mr. Brodsky is a cold blooded individual who is willing to murder for financial gain. The motive and the method of his crime indicates that Mr. Brodsky is not the type of individual likely to be rehabilitated merely by the passage of time. His presence in the community would pose a

threat to public safety. On behalf of the citizens of Los Angeles, it is the request of the Los Angeles Police Department that Mr. Clifford Brodsky be denied parole. As far as your last most recent (inaudible) Dr. Marek, M-A-R-E-K, psychologist, first initial is W. middle initial is K. What I'm going to do on this, I'm just going to hit some high points or highlights after reading through the psych report. They always give some kind of diagnostic impression. What this doctor did on, on Axis I, the doctor writes, adult anti-social behavior, Axis II, none, Axis III, none, on Axis IV, incarceration, on Axis V, GAF is 90. That's on a scale from zero to 100, with 100 being very good, but that's pretty high. Under the doctor's section of assessment of dangerousness, I'm just going to again read from the doctor's report. Within a controlled setting, his violence potential is obviously lower than average due to his clean disciplinary record. If released to the community, his violence potential is lower than average due to his excellent institutional adjustment, long past history of pro-social behavior, the fact that his sentencing judge released a man facing life in prison out on bail without restrictions and a lack of drug slash alcohol problem. The last

paragraph on that page reads, a 2005 BPT decision requests that the next psychological evaluator address issues regarding the statement quotes made in 1991 in that psych evaluation that was related to post traumatic stress disorder, parenthesis sic close parenthesis because those issues just sort of went away without really being addressed. And, in particular, the fact that the doctor at the time indicated that he felt that Mr. Brodsky was a ticking time bomb. There was a lot of stuff going on in that report and just got ignored in the future end of quotes. In 1994 BPT psychological evaluator twice noted that she believed Brodsky was not experiencing current symptoms of post traumatic stress disorder and that the instant offense was an isolated incident. That BPT evaluator also believed that Brodsky quotes seems to have explored the committed offense and has come to terms in part with its underlying causes close quotes. The 1991 evaluation was completed at the request of Brodsky's attorney and was submitted in an attempt at mitigation. With all due respect to Mr. Brodsky's 1991 evaluator, even if Brodsky's symptoms at the time rose to the level of being diagnose able, it is not true that quote full recovery from PTSD is possible only when the

patient receives intensive treatment close quotes. Brodsky has never received such treatment, and there's no evidence whatsoever if his file that he has ever again displayed PTSD like symptoms. Also, after all this time, it is clear that Mr. Brodsky is not a quote ticking time bomb close quotes. He has a better candidate for parole than almost all inmates. There are no obvious or subtle significant risk factors and precursors to violence. And those are my highlights. Mr. Martinez?

**PRESIDING COMMISSIONER MARTINEZ:** All right. Thank you. I'm going it go to questions (inaudible) as to now where you're at as you sit here today. How do you feel about this? (Inaudible).

**DEPUTY COMMISSIONER MUGA:** Go ahead, sir.

**INMATE BRODSKY:** I certainly feel bad about what I did at the time, and I was wrong. (Inaudible) the anguish that it caused people (inaudible) there was children involved (inaudible) accepted my responsibility. I am responsible (inaudible) what I did and why I did it (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible) serious thing?

**INMATE BRODSKY:** (Inaudible) families

involved (inaudible) my family (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** I don't have any further questions. (Inaudible).

**DEPUTY COMMISSIONER MUGA:** No.

**PRESIDING COMMISSIONER MARTINEZ:** Counsel?

**ATTORNEY:** I have no questions.

**PRESIDING COMMISSIONER MARTINEZ:** No questions.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** I have no questions.

**PRESIDING COMMISSIONER MARTINEZ:** All right. (Inaudible) closing statement.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** Actually, I do have a couple. I'm sorry. Mr. Brodsky there's an indication in the report of the psychologist it talks about the fact that you were released on bail (inaudible) following your conviction. Is that accurate?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** You were out on bail from the time of the offense in 1989 until the time of your conviction in 1991, correct?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And following the conviction, you actually pled guilty; is that correct?

**INMATE BRODSKY:** (Inaudible).

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And at that time, there was a determination made by the court (inaudible) you're not familiar with Penal Code Section 1270 (inaudible), correct?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And the standard that has to be met in order to receive post-conviction bail?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And the judge at that time made a comment based upon your (inaudible) District Attorney stipulation that you would not pose a risk to the public if released on bail; is that correct?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And you understood that was a finding that had to be made based upon (inaudible) evidence, correct?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And you actually turned yourself in to the prison in Chino, correct?

**INMATE BRODSKY:** Yeah, the sentencing clerk (inaudible).

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** So following your conviction, (inaudible) imposed

the sentence of 15 years to life, correct?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And knowing that that was your sentence, you turned yourself in to Chino directly?

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And in the interim time between that, you were out on the streets?

**INMATE BRODSKY:** Right.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And when you turned yourself in, understand there was a situation involving your wife at that time. Can you explain what happened?

**INMATE BRODSKY:** (Inaudible) never seen anything like that before, and (inaudible) my wife was very upset, obviously, and she was crying and (inaudible) back out in the parking lot and talked to her and calmed her down. (Inaudible) went back out in the parking lot and talk to her about a half hour or so and then returned.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** (Inaudible).

**INMATE BRODSKY:** Yes.

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** I have nothing further.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** I'd just like to believe and I'd like to correct the record and say that there were a few times that the District Attorney's office would not oppose Mr. Brodsky being paroled at the earliest possible time. That's incorrect. (Inaudible) the agreement was that when the Board of Prison Terms sees fit to parole Mr. Brodsky, I would, meaning Mr. (Inaudible) representative of the DA's office, I would agree with that determination in that I would have no opposition to Mr. Brodsky being paroled at the first date that the Board of Prison Terms deems would be suitable. In conformity with that agreement (inaudible) people at this time (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** All right. Thank you very much, sir. Counsel?

**ATTORNEY:** I would submit that the District Attorney has a moral obligation -- the District Attorney has an obligation in this case (inaudible) represent to this Panel the actual nature of the conviction and the actual agreement that was reached, and if you look at the sentencing transcript, it's in the Central File, Page 10. (Inaudible) quote, I think Mr. Brodsky

should be fairly punished for what he has done, and I would state as I did once before that I would not oppose his release at the first available opportunity. That is exactly what I said at the beginning of this, and that's what we've been saying all along, at the first available opportunity. That was his initial parole hearing, and the District Attorney's obligation is to not have any objection, not simply not take a position, not remain neutral. They were obligated to actually come in here and represent that they had no objection to the parole. At the time of the plea, Mr. Hodgeman, a very seasoned prosecutor back at the time, actually stated that he would place a memo in my file so that some years hence when the District Attorney, if not myself, defends that lifer hearing, that this disposition is represented by the record as no (inaudible) represented to the appropriate author its at this time. This is a very serious agreement that was entered into between the prosecutor and Mr. Brodsky and the court. It was based upon a lot of different factors, and what you see here is some of those factors that led to Mr. Hodgeman and the court entered into that agreement, one of which is this issue of post-conviction bail. In the years I've

been doing this, I've yet to see that. There has not been an individual that I have seen other than Mr. Brodsky who has received a 15 to life sentence and turned himself directly in to state prison. That is just a very unique situation. There is a requirement under Penal Code Section 1272.1, and that requirement is (inaudible) on a motion for post-conviction bail to hold a hearing (inaudible) special findings. It was indicated at the beginning of this proceeding that the Board was bound by the decisions made by the trial court. This is one of the decisions that was made by the trial court, and it was made with the stipulation of the District Attorney's office, and that stipulation was that by clear and convincing evidence, it has been shown that Mr. Brodsky did not present an unreasonable risk of danger to society if released on parole. If you look at 2402A, it's the same standard, does Mr. Brodsky currently present an unreasonable risk of danger to society if paroled. It's the same thing. If you release him out to society, does he present an unreasonable risk of danger. It's the same finding that the Board made back in -- excuse me, that the court made back in 1991, at the time of the conviction. That finding is binding on this Board. That finding

is a finding that Mr. Brodsky did not at that time present an unreasonable risk of danger if released. Now, play that forward. What's happened in the years since then? Everything that you can see is good. We didn't really talk about it much. Mr. Brodsky has no 115's. He has no 128's. No one has even saw fit to write him up for being out of bounds, being disrespectful to staff, on following inspections. He has, now, for 15 plus years conducted himself in an exemplary fashion. Doing that in a prison is something that (inaudible). Most of the guys have had a few 128's and a 115. But seeing somebody who has no 115's, no 128's, literally perfect programming in prison. What else has he done? He came here, he had a bachelor's degree, he had a master's degree. He had a long history of significant success in the business world, but did he just leave that alone? No. He completed essentially three trades, made himself even more marketable when released. What's he done in terms of self-help? His self-help programming has been, again, another area that you would look at and you would say not only has he done the things we would expect of him, but he's gone way up to the distance. He's gone an extra mile. Back in '93, he does a codependency workshop.

Mr. Brodsky doesn't come from a home broken by alcoholism, but he used that as something where he could learn about ways to improve yourself. He then goes into addiction recovery workshop. He learns about the 12 steps. He goes through a substance abuse program in 1999. He attends Alcoholics Anonymous and Narcotics Anonymous in '98 and '99 (inaudible). These are all things that there's no motive for him to do this. He's doing it because he's looking for ways to improve himself. He doesn't have an alcohol problem. He doesn't have a drug problem, but what he's doing is he's used the ability to essentially see something that's available to him, take it, participate in it, and take from it the things that he can (inaudible). As we all know, if you look at any type of, you know, there's so many different types of self-help programs that base themselves upon the basic 12 step approach of Alcoholics Anonymous, and he's able to use that in his life to improve himself, which no one asked him to do, no one suggested to him that he needed it, but he did it. And then we look at the psychological reports and right from the get go, you start off in this case who admits responsibility. He's taken full responsibility for what he did. He not only pled guilty, but he

walked down to the prison halls and turned himself in, you know, facing a 15 to life sentence. He's out on the streets. He walked himself in and took care of his responsibility. He showed up, and starting with the psychological report in 1994, which shows that he's got good insight. He's explored the commitment offense and come to terms with some of the causes of the commitment offense. And as you come forward and look at the subsequent evaluations, it just keeps getting better. He's got much more insight. He's got a far greater understanding of the circumstances that led to the commitment offense. Dr. Turini's (phonetic) report is extremely telling. He talks about, you know, significantly below average relative to this (inaudible) inmate population in terms of violence potential. Normal violence potential than the average citizen. There are no significant risk factors. We also have the fact that he does not have a mental health disorder. He does not need treatment. He's never had a significant drug or alcohol problem. And he concludes with saying that Mr. Brodsky is quote an excellent candidate for parole consideration. This is back in 1999, and coming forward since that time, you'll see that his next see evaluation, I believe it was

for the '05 hearing, if I'm not mistaken, yes, April of '05, my Dr. Macomber. Again, we've got a GAF score of 90, which, anybody that, you guys see GAF scores all the time in these cases, and a 90 is probably, you know, it's a better functioning than many of us, so it's a very strong GAF score, and he's had that consistently. He had it back in the '99 hearing, I'm sorry, the '99 evaluation by Dr. Torini, had it with Dr. Macomber, had it again this year with Dr. Marek. And each of those doctors along the way has said his prognosis for being able to maintain his current excellent adjustment in self-control if released from the community is good. So he's always had a strong prognosis from each of these doctors. And he talks about in each of these evaluations the irrationality with which he was acting and the extremely poor judgment that he was using (inaudible) how he was functioning beyond his capacities and out of his experience zone, but he has never at any time denied responsibility or attempted to mitigate the criminal act that he committed. (Inaudible) is to reevaluate what's important in life, and the things that were key issues to him back at the time that the crime was committed was (inaudible) position of being CEO of a company, of being

successful in life, of not being able to tolerate people that failed, not being able to tolerate people that he perceived as having betrayed them, and you look at those things and how he's taken care of that. Now, living a simpler life is something that appeals to him, and he talks about that in various psychological reports, how, you know, being that CEO of a company is not what he's seeking to do. He's seeking to do something earning a decent living and be able to, you know, conduct himself appropriately out on the streets. You know, he's learned not to hold feelings of anger or resentment. We've seen some very excellent programming in terms of the self-help and all the anger management classes that he's taken, so he's learned all of these things that he needs in order to be safely released out in the streets. And then we have the current psychological evaluation. There really isn't a whole lot that's new in the current psychological evaluation because it simply carries forward all of these same good, positive, strong findings that we see, you know, really starting in '99, showing themselves early in '94, but becoming real solid by 1999, and then in 2005 and in 2006 reports, what this doctor does, Dr. Marek is he talks about some concerns that were raised at the

2003 and 2005 Board decisions, and it's Page 3 where he goes into essentially an evaluation of each of those points and why those don't create any type of concern over Mr. Brodsky, and part of that was read, the 2003 report that talks about the extent to which the person has explored the commitment offense and come to terms with the underlying cause, and the doctor goes and in and gives a very good description of why the underlying offense took place and what it is that's different Mr. Brodsky and how these generally pro-social values that he had that went awry back in the past are not going to turn into something that creates him having a -- presenting a danger at this time. And so I would urge you to take a good close look at what Dr. Marek says on Pages 3 to 4. And then there was that issue about the post traumatic stress disorder, and, you know, again, look back to the '94 record because that's had the doctor first starts to talk about the fact that he doesn't have any symptoms at that time. So, even though he did in 1991, by 1994, that issue was resolved. It carries forward to '99, 2005, 2006, so the consistency since that time has shown that that issue has been resolved and resolved favorably. There are no adverse marks on Mr. Brodsky's

record. If you look at this case, this is not a crime that should preclude the setting of a parole date. This is not a particularly egregious offense in a legal sense (inaudible). It's certainly a serious offense, but when you talk about the (inaudible) that are required here, this is not an offense that should bar Mr. Brodsky from receiving a parole date. You should also, when looking at Mr. Brodsky, consider the fact that although this has technically been referred to as his fourth subsequent parole hearing, his initial hearing was actually 14 months late. His second hearing was an additional ten months late. His first subsequent was two months late. The first one was ten months, the second two months, the third nine months, fourth, three months. He's actually had three years two months of additional delays beyond the normal denial period. So, had these hearings been conducted in a timely fashion, this would actually be his seventh time that he'd be due to come up for hearing. You know, the denials in this case previously have only been for one year because he comes back with the expectation that he should be suitable the next time he arrives, and each time he's been sent off to do certain tasks. Each time you have asked

him to do certain things, he's (inaudible). Each time he's still disciplinary free. Each time he's upgraded himself. Each time he's come back with more self-help programming. So, at this point, the only appropriate action to take would be to set a parole date. I think that under the, even a completed second degree murder matrix, that would fall in the 17 to 19 year range. With his credits right now (inaudible) and another 16 months of (inaudible) so he's already exceeded the period of time that would be appropriate under the high end of the matrix. So I would urge you to set a date at this time.

**PRESIDING COMMISSIONER MARTINEZ:** Thank you, Counsel. Mr. Brodsky, this is now the opportunity if you'd like to address the Panel as to why you feel you are suitable for parole.

**INMATE BRODSKY:** In 1989, I committed a crime, a crime that impacted (inaudible) if I could, I'd unwind it, but I can't. Nobody can (inaudible) but what I did do (inaudible) plead guilty (inaudible) accepted my responsibility, and I still accept my responsibility. Nobody can change what I did. What I did was wrong. (Inaudible) my responsibility. I owe that to society to pay (inaudible) and my way to pay for what I did. And while I've been in prison, I

have tried to look at myself, see why I did what I did, understand it (inaudible) attending all the self-help that I possibly could do and at the same tame (inaudible) and, again, cannot unwind the past. I simply can't erase what I did. All I can do is what I have done (inaudible) I had my parole plans if I get out. I'm very fortunate. I'm older (inaudible) but I'm fortunate in that I come from a very close-knit family who are (inaudible) my family (inaudible) my family takes care of its own (inaudible) in that respect. But, again, (inaudible) and all I can do is (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** Okay. Thank you very much, sir. At this point (inaudible) I'd like your full name and.

**INAUDIBLE VICTIM NAME:** It's very interesting because Mr. (Inaudible) says this is not (inaudible). However, my entire family, my wife is still terrified. My two daughters, it has affected them since it all happened. I had a break down a year ago, and the therapist said that she believes why it took so long (inaudible) was done to me. I was -- I was a very successful business person. That's why Mr. Brodsky came to me, and in the last 15 years, I've had to file bankruptcy twice because that same person who was

successful has been damaged to that degree. And I just would like to know what (inaudible) constitute something he (inaudible). My wife, at every other hearing she's gone onto (inaudible) today as well.

**ATTORNEY:** I would object to that. There should not -- this is not a homicide case.

**PRESIDING COMMISSIONER MARTINEZ:** (Inaudible).

**ATTORNEY:** I think the regulations are clear that the victim is allowed to speak, and he's been allowed to speak. There is no other victim in this case.

**PRESIDING COMMISSIONER MARTINEZ:** All right. Thank you. (Inaudible) as well (inaudible).

**MARY (INAUDIBLE):** My name is Mary (inaudible), and what my husband neglected, because of Mr. Brodsky's actions, we lost our home. The breakdown that my husband had, I came very, very close to having him committed, and we now have one daughter who is in very serious therapy. Obviously, it has affected me tremendously. There is no doubt in my mind that Mr. Brodsky has not been a perfect inmate doing absolutely everything that he seen fit to do to have a perfect record. His education, everything

that goes for him, he's a distinguished naval officer, all of those things, he had a high position in a company and knew exactly what he was doing, and he made a comment about revenge, which is still the thing that will never leave my mind, that revenge is like leftovers, you take them the next day, and you eat them cold, and this is something that (inaudible) and I'm sorry. Again, all the records everything show that my children, his children, I'm deeply sorry for them too, but what has happened, I don't -- I'm not comfortable and I am, grateful that LAPD (inaudible) the same way I do, and they were there for us, thank God for them or my husband and perhaps I would have been dead because the hit man was at the hotel when we arrived, and it's only the grace of God that one of his employees went to their attorney and the DA, and that's why we're alive. That's the only reason. And (inaudible).

**PRESIDING COMMISSIONER MARTINEZ:** All right. We're going to go ahead now and recess for deliberations.

**R E C E S S**

--oOo--

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, KERRY VIENS, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 58, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CLIFFORD BRODSKY, CDC No. H-07665, on NOVEMBER 6, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JANUARY 18, 2007 at Sacramento County, California.

Kerry L. Viens

_______________________________
Kerry Viens
Transcriber
**Northern California Court Reporters**

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**DEPUTY COMMISSIONER MUGA:** Okay. We're back on the record.

**PRESIDING COMMISSIONER MARTINEZ:** All right. Everyone that was previously identified has now returned in the matter of Clifford Brodsky, CDC number H as in Henry, 07665. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society and threat to public safety if released from prison. Now, Mr. Brodsky, I'm going to tell you this is a one-year denial right off the get go. Again, it's based on the commitment offense. It was carried out in an especially cruel and very callous manner. Again, the offense was a situation where the crime was a planned crime, conspiracy with another, a very cold blooded plan to murder the victim, Robert (inaudible). Again, you had been planning to kill Mr. (Inaudible). The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard

for human suffering. Again, the prisoner did not take into consideration the impact it had on all parties involved in the situation. The motive for the crime was inexplicable and very trivial in relation to the offense. And, again, (inaudible) greed, financial gain (inaudible) by the prisoner that it was out of fear for looking incompetent if the deal failed, and, so, again, a number of different motives for involving (inaudible) the crime. Again, the conclusions are drawn from the statement of facts wherein the prisoner again on March the 1st of 1989 and July the 11th of 1989, the prisoner conspired with another person to murder Robert Klugman. In March of 1989, two hit men were hired to kill Mr. Klugman in order to get paid the proceeds of a $1.25 million life insurance policy. Security officers were alerted at the Los Angeles Police Department in regards to the murder of Robert Klugman, and it was averted. The prisoner does come from a stable, on all counts, a very stable social background with no criminal history. Again, with regards to institutional behavior, the prisoner has actively participated in beneficial self-help and therapy programs. I would like to note that he lacks misconduct while

incarcerated. He does not have any 128 counseling chronos or serious 115 disciplinary reports. The psychological report dated August 25th of 2006 authored by Dr. Marek is supportive for release. In regards to your parole plans, sir, you do have solid parole plans. And concerning the PC 3042 responses, again, the hearing Panel notes that the responses to PC 3042 notices indicate opposition to a finding of parole suitability, specifically from the Los Angeles Police Department, which, again, is the law enforcement agency investigating the case, and again, they are in opposition. In regards to the District Attorney's office of Los Angeles County, they take opposition at this time. I'd like to note that the Deputy District Attorney from Los Angeles County is present and indicated that, again, they do not (inaudible) at this time regarding Mr. Brodsky's parole suitability. Nevertheless, the prisoner is to be commended for his earning (inaudible) vocations as well as his excellent work rating, participation in self-help in regards to the 12-week anger management course, six-week Cage Your Rage course, as well as the video (inaudible) and the veteran's self-help group as well as remaining disciplinary free

throughout his incarceration. However, those positive aspects of your behavior do not outweigh the factors of unsuitability. The Panel recommends that the prisoner remain disciplinary free, if available, continue participation in self-help and therapy programs, and, again, Mr. Brodsky, in regards to (inaudible) looking into prior transcripts as to some of, again, I note you elected not to speak today regarding the commitment offense, and that certainly is your right. There were some things that were of concern to the Panel, specifically your role. We felt again that there was some minimization in that that was addressed at previous hearings. I want to say those are the 2001 (inaudible). In regards to the 2001, December the 5th of 2001, (inaudible) need to be following, hearing September 27th, 2002 and then November 19th, 2003 where, again, regarding your role in what you'd told the Panel as to what you were doing as far as your, again, role as to whether you were the person that actually controlled this and planned it all out or not. And, again, there were some issues there where you indicated that you did not, that you were not the main player in this particular crime and that there was another

individual that's been named. And, again, I'll indicate (inaudible) based on reports that were you the person that was calling the shots on this and (inaudible) the main player. So that is, again, a concern, something that you might want to look into. Commissioner, do you have any comments?

**DEPUTY COMMISSIONER MUGA:** Yeah. Here's some thoughts from you, Mr. Brodsky. You know, I went over the types of self-help courses that you participated in during the last 12-month period, and I'm really glad that you participated in those, but I'm going to make a suggestion. I'm not saying you have to do this, but what you might want to do is, of a man of your intellect, I guess that's a good way (inaudible) without a doubt. I'm going to suggest that you might want to be doing some self-readings, and I can (inaudible) where I've taught (inaudible). I guess what I'd like to hear from you is something more in depth, and that's why I'm suggesting maybe some self- reading, some, just, write a paragraph or two summary and just showing the next Panel that you come before that you've read this material and kind of (inaudible) on what you've learned from it. I guess I'm looking for

something more in depth, so, you know. I went through your C-File again, combed through it, and I didn't see a lot of laudatory chronos. You're doing what you need to be doing. You're on that track, but I didn't see something that's going to show some more deeper understanding. I guess that's what I'm looking for. It's clear that you can do that (inaudible). I'm not saying you have to do that. I'm just putting that out there for you, okay, as a suggestion.

**PRESIDING COMMISSIONER MARTINEZ:** Mr. Brodsky, again, we're not taking away from these other things that you've done. You've certainly done quite a bit, and again, we highly commend you for it, remaining disciplinary free. I think you should continue on as you are in your course, and again (inaudible) so with that, this will conclude this hearing.

**ATTORNEY:** If I could just --

**PRESIDING COMMISSIONER MARTINEZ:** It is 3:15 p.m.

**ATTORNEY:** Could I just ask one question for clarification. I'm just a little confused as to what exactly you're asking him to do.

**PRESIDING COMMISSIONER MARTINEZ:** We've already stated that, sir. This hearing is now

concluded and it's 3:15 p.m.

**ATTORNEY:** I'm just looking for clarification. I need to be able to get, to tell me client what he should or shouldn't be doing in --

**PRESIDING COMMISSIONER MARTINEZ:** As I said, the hearing is now concluded, sir. All right.

**ATTORNEY:** Are you kidding around?

**PRESIDING COMMISSIONER MARTINEZ:** This hearing is now concluded.

**ATTORNEY:** I can't ask a question of clarification to determine --

**PRESIDING COMMISSIONER MARTINEZ:** I think we've already stated on record exactly what our (inaudible) are.

**ATTORNEY:** You haven't put exactly on record that you've indicated he needs therapy --

**PRESIDING COMMISSIONER MARTINEZ:** Sir --

**ATTORNEY:** And --

**PRESIDING COMMISSIONER MARTINEZ:** I'm not going to sit here and go through, going back and forth and argue about this (inaudible).

///

///

///

///

**ATTORNEY:** I'm not going back and forth and arguing, Mr. Commissioner. I'm asking of clarification of what type of therapy you expect him to get --

**A D J O U R N M E N T**

**--oOo--**

**PAROLE DENIED ONE YEAR.**

**THIS DECISION WILL BE FINAL ON:** MAR 0 6 2007

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, KERRY VIENS, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 58, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CLIFFORD BRODSKY, CDC No. H-07665, on NOVEMBER 6, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JANUARY 18, 2007 at Sacramento County, California.

Kerry L. Viens

__________________________________
Kerry Viens
Transcriber
**Northern California Court Reporters**

# Exhibit "B"

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**PRESIDING COMMISSIONER FISHER:** All right. I want to note for the record that everyone who was previously in the room and identified themselves have returned to the room. Mr. Brodsky, the panel relies on the information (indiscernible) and relied on the following circumstances in concluding that you're not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Essentially what it comes down to, Mr. Brodsky, is that we are denying your parole for another year, and it's based on the commitment offense. This was certainly -- this was a callous offense. This was a situation where for money, a victim was picked and plans were made, and a killer was hired, and taking into no consideration at all what the impact of this action would be. Had -- had things gone forward, certainly the impact would have been greater, but -- but clearly, and listening to Mr. Krugman speak today and also his wife about the impact of the crime on their lives, and this was just a very cold-blooded plan to take someone's life. This panel is concerned with that -- the ability to so coldly plan something like that. Also, there just are some questions that we haven't had answered, and in

order to address some of those questions, I am asking for -- I know you just recently had a psych evaluation -- I'm not asking for another full one. But what I am going to ask for is that you be evaluated regarding the statements that were made in 1991 in that psych evaluation that was related to post-traumatic stress order, because those issues just sort of went away without really being addressed. And in particular, the fact that the doctor at the time indicated that he felt that Mr. Brodsky was a ticking time bomb. And he also noted that Mr. Brodsky likened the victim to President Johnson, in that he felt they both had betrayed his trust. There was a lot of stuff going on in that report that just got ignored in the future. And so I'm just going to ask that those issues you could take care of so that it's not a question in the future. We don't really know, and in part because we -- we didn't ask Mr. Brodsky questions today -- but we don't really know why Mr. Brodsky is capable or was capable at that time of being involved in something that -- that was so cold-blooded, and was capable of being part of a plan to kill a man for an insurance policy. So I think it's important those issues be addressed. And that's the bottom line, Mr. Brodsky. You're doing a good job with your parole hearing. I want to note that the psych report's current

(indiscernible) about 1994 have been positive. The 1994 report addresses the post-traumatic stress disorder and the fact that it was raised, but simply states that the doctors didn't feel that Mr. Brodsky was experiencing PTSD at that time, and never -- and never went into anything about why -- if those issues were resolved, how they were resolved, when the '91 report said that he needed intensive treatment. So we need to get that question answered. I want to note that Mr. Brodsky has good family support, that he has parole plans, that he has a job offer, and that in general he is programming well. So once again, the one-year denial is based on the commitment offense.

**ATTORNEY DEFILIPPIS:** Just -- just for the record, I would note that the 1991 report, we talked about the fact that psychological reports were in the file at the inception of this hearing; however, I do not have the 1991 report. That is not contained in the hearing packet. It should be noted for the record that is not a CDC report. That was done by an outside psychologist. It is not part of the materials that were provided for consideration at this hearing. I would like a copy of it before I leave here today, since I've never -- I've never seen it before, and it apparently is being used in conjunction with denying parole to Mr. Brodsky.

**DEPUTY COMMISSIONER HARMON:** Excuse me, counselor, you did have access to the C File in preparation of the hearing, didn't you?

**ATTORNEY DEFILIPPIS:** I've never seen that report.

**DEPUTY COMMISSIONER HARMON:** It was -- it was in --

**PRESIDING COMMISSIONER FISHER:** It's in the Central File.

**ATTORNEY DEFILIPPIS:** I assume -- I assume when I receive a Lifer hearing packet from CDC that I'm being provided with all of the psychological reports that are contained within the file. I think I'm entitled to that presumption, as a long history of dealing with CDC on getting Lifer hearing packets. The Lifer hearing packet is expected to contain all of the psychological reports. It did not in this case.

**PRESIDING COMMISSIONER FISHER:** Thank you. Do you have any comments?

**DEPUTY DISTRICT ATTORNEY DELADIGNE:** Nothing further.

//

//

//

//

//

**ATTORNEY DEFILIPPIS:** Can I have somebody copy that?

**DEPUTY DISTRICT ATTORNEY FISHER:** Yeah. (indiscernible).

--oOo--

**PAROLE DENIED ONE YEAR**

**THIS DECISION WILL BE FINAL ON:** ______ 21

**YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

**CALIFORNIA BOARD OF PRISON TERMS**

**D E C I S I O N**

**DEPUTY COMMISSIONER LOPEZ:** We are back on record.

**PRESIDING COMMISSIONER WELCH:** Okay. Mr. Brodsky, we do have a decision. By the way, everyone that was here before have returned. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner would be an unreasonable risk of danger to society or a threat to public safety if released from prison. One, we do feel that the crime was especially coldhearted. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner that demonstrated a disregard for the suffering of another human being. And the motive for the crime was trivial and explicable. The conclusion was drawn from the Statement of Facts wherein on and between -- March 1, 1989 the prisoner conspired with another party to murder Mr. Krugman. In March of 1989 two hit men was hired to kill Mr. Krugman in order to obtain the proceeds of a one point 25 million dollar life insurance policy. The security officer for the Mary Jane Company alerted the Los Angeles Police

Department to the plot and on July 5, 1989 the murder of Robert Krugman was averted. The prisoner have no prior criminal history. There's no indication that the prisoner had an unstable social history. It's quite the contrary. He served honorably in the United States Navy as an officer, well educated, has a Masters Degree. So there's no indications whatsoever he had an unstable social history. While in prison -- while in -- While in prison, the prisoner has programmed. A recent psychological report shows that the prisoner is making progress, shows -- that his level of dangerousness both in and out of the structured environment shows that it's reduced, shows that he's on the right track, that he's making a lot of progress. It says he doesn't have a mental disorder. It says if released to the community his violence is -- potential is estimated to be no more than the average citizen in the community. They say there's no significant risk factors. The prisoner does have parole plans. He have a place to live with his wife, I mean with his daughter. He have a job offer. The hearing Panel notes that in opposition to a finding of suitability the District Attorney did not make a statement in opposition, one way or the

other. We do note that there are two victims here and they voiced strong opposition to a finding of suitability. We also note that there are several victim letters in the file voicing strong opposition to a finding of suitability. The victim's childrens wrote a heart-wrenching letter in terms of opposition to suitability. The Panel makes the following findings: The prisoner needs to continue on the road that he's on, continue to participate in positive programs, continue to participate in programs that will enable him to be able to face stressful situations like the instant offense and be able to face, discuss and understand and cope with those situations in a nondestructive manner. Until enough -- Until enough progress is made, the Board still have concerns about the prisoner's threat to the public. Nevertheless, there are a lot of things we need to commend him for also. The prisoner have been a very good prisoner so to speak. No disciplinaries, good work reports, the prisoner have a solid educational background, a solid work background prior to coming to prison. So certainly the prisoner is on the right track. However, those positive aspects of the -- of his behavior does not outweigh the factors of

unsuitability. So the prisoner's parole is going to be denied for one year. Certainly a factor (inaudible) is a crime, and not only a crime but the crime in terms of how it impacted the lives of the victim. Apparently it had a devastating affect on them so certainly the Board had to weigh -- that weighed heavily on the Board's mind when we was deliberating and coming to the decision in terms of (inaudible). However, the Board recommend that the prisoner remain disciplinary-free. We recommend that you continue in the positive program that you're on, continue on the track that you're on, continue to participate in whatever types of programs that may be available to you, whether it's self-help or reading books or other types of -- other types of activity that would give you insight into the crime and help you be able to face stressful situations on the outside in a nondestructive manner. We're also requesting a new psychological evaluation be completed. We're requesting that the prisoner's violence potential in the free community be explored, the extent to which the prisoner have explored his commitment offense and whether or not there's any need for any further treatment while in prison or self-help programs

while in prison. That concludes the reading of the decision. Commissioner, comments?

**DEPUTY COMMISSIONER LOPEZ:** No comments.

**PRESIDING COMMISSIONER WELCH:** Okay. This hearing is concluded at approximately 1645. Good luck to you, Mr. Brodsky.

--oOo--

**PAROLE DENIED ONE YEAR**

**FINAL DATE OF DECISION** FEB 17 2004

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, Marsha Mees, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 61, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CLIFFORD BRODSKY, CDC No. H-07665 on NOVEMBER 19, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated December 5, 2003 at Sacramento County, California.

Marsha Mees
Transcriber
**CAPITOL ELECTRONIC REPORTING**

**CALIFORNIA BOARD OF PRISON TERMS**

**D E C I S I O N**

**DEPUTY COMMISSIONER LEHMAN:** We're back on the record.

**PRESIDING COMMISSIONER MUNOZ:** All right. Thank you. It's about 22 minutes after one p.m. And the parole consideration hearing for Inmate Clifford Brodsky has resumed with all parties having returned to the hearing room. And Mr. Brodsky, this Panel reviewed all information received from the public and relied on the following circumstances in concluding that you are not suitable for parole and that you would pose an unreasonable risk of danger to society if released from prison. And my colleague and I agreed on a one-year denial in your case. We considered many factors. First and foremost was the commitment offense and its nature. This offense was carried out in a cruel manner with a disregard for human suffering, and also this offense, commission for conspiracy to commit murder, was obviously carried out in a calculated manner. These conclusions are drawn from the Statement of Facts wherein the prisoner, according to the documents before us and the police investigation and in spite of the inmate's denial, he, the inmate, led a conspiracy

to kill the victim in this crime for a one and a quarter million dollar insurance policy. If not for the fact that the hired hit man in this case notified the police, the victim in this particular crime would have been shot and killed. The inmate has done well while incarcerated. However, this Panel feels he has not sufficiently participated in beneficial self-help and therapy programming. And the -- He has a good psychiatric evaluation. And the parole plans appear to be in order. We note that the District Attorney from the county of Los Angeles -- I just drew a mental block here. Did you oppose parole suitability? You did not.

**DEPUTY DISTRICT ATTORNEY KRAUT:** Absolutely not.

**PRESIDING COMMISSIONER MUNOZ:** You did not.

**DEPUTY DISTRICT ATTORNEY KRAUT:** We have no -- We did not oppose parole.

**PRESIDING COMMISSIONER MUNOZ:** Okay. All right. You did not oppose. And that (indiscernible) back to the agreement that was made during the plea bargain.

**DEPUTY DISTRICT ATTORNEY KRAUT:** Absolutely.

**PRESIDING COMMISSIONER MUNOZ:** Okay. Right. We do note that the next of kin, the victim and his wife, they are present here today, both oppose

parole suitability for this inmate. And we do make the following findings, that the inmate does need to participate in any and all self-help and therapy programming that may become available in order to face, discuss, understand, and cope with stress in a nondestructive manner. We appreciate the inmate's behavior while incarcerated. We also hope he stays on that path. He should be commended for some of the things that he's accomplished. I think he completed a vocational textile. He's also received certificates from Blackstone Legal School, or whatever it was, (inaudible) -- excuse me, paralegal. And again, his behavior has been exemplary. The positive aspects of his behavior do not outweigh the factors of unsuitability. As I indicated, we recommend that you remain disciplinary-free, that you take part in any and all self-help and therapy programs that may become available. Any comments you care to make, Mr. Lehman?

**DEPUTY COMMISSIONER LEHMAN:** I have nothing further.

**PRESIDING COMMISSIONER MUNOZ:** All right. It's 1:26 p.m. And that concludes the hearing for Inmate Brodsky.

**ATTORNEY DEFILIPPIS:** Excuse me. Before we

go off the record, there was one question I had of you, Mr. Commissioner. You mentioned that he needs some additional self-help and therapy. And I was just wondering if you could give some guidance as to what types of things the Board is --

**PRESIDING COMMISSIONER MUNOZ:** Well, I mentioned whatever may come his way. Whatever becomes available, he should take part in. It would -- Participation or completion in any self-help programming, any self-help and therapy programming that may become available. I understand therapy is not available at the present time. But if it should become available, he should participate. It would only enhance his chances to gain parole suitability.

**ATTORNEY DEFILIPPIS:** The concern I have is that here at CTF there is not a lot of self-help and therapy available.

**PRESIDING COMMISSIONER MUNOZ:** Right.

**ATTORNEY DEFILIPPIS:** And it appears to me from my experience with inmates around here that he has done pretty much everything that's available to him.

**PRESIDING COMMISSIONER MUNOZ:** Well, one of the other things we suggest at times is that the inmate become involved in a self-help or cell study

program. He may consider reading various motivational or inspirational books that may assist him not only in coping with his incarceration, with his culpability with the crime, with his readjustment to society, any books of that type that could help him out would be appreciated by any Panel that he comes before. He should consider maintaining a list of those types of books and bringing that list with him to his next parole consideration hearing. I think I saw in the initial psychiatric evaluation that your client wanted to study the Hebrew language or something. I think I read -- I recall something like that, I believe. And if he does get involved in that, that would certainly show that he's spending his time wisely, things of that nature. That's all I can say. Anything you want to say other than that?

**DEPUTY COMMISSIONER LEHMAN:** I have nothing further.

**PRESIDING COMMISSIONER MUNOZ:** Okay. And that's about it, sir. All right. That concludes the hearing. It's 28 minutes after one p.m.

--oOo--

**PAROLE DENIED ONE YEAR**

**EFFECTIVE DATE OF THIS DECISION** OCT 18 2002

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**PRESIDING COMMISSIONER WELCH:** The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The offense was carried out in an especially cruel and callous manner. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was inexplicable or very trivial in relationship to the offense. The conclusions are drawn from the Statement of Facts [recorder malfunction]. In March of 1989, two hit men were hired to kill the victim in order to obtain proceeds from a 1.5 million dollar life insurance policy. The Security Officer of the Mary Jane Company alerted Los Angeles Police Department of the plot on July 5th, 1989. [Recorder malfunction] -- discuss, understand and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable

and a threat to others. However, there are things that the prisoner should be commended for.

(Thereupon, the remainder of the hearing proceeded during recorder malfunction.)

--o0o--

**PAROLE DENIED** ______________

**EFFECTIVE DATE OF THIS DECISION**______________________

BOARD OF PRISON TERMS STATE OF CALIFORNIA

**BOARD REVIEW COMMITTEE REVIEW OF PROPOSED DECISION**

INMATE: **BRODSKY, Clifford** CDC NUMBER: H-07665

TYPE OF HEARING: Initial parole consideration DATE OF HEARING: 12/05/01

☐ Affirm original decision ☐ Schedule new hearing ☐ Modify decision

Disapprove the proposed December 5, 2001 hearing decision and schedule a rehearing of the prisoner's initial parole consideration hearing on the next available calendar.

SUPPORTIVE REASONING FOR DECISION: *See attached BPT form 1138*

COMMISSIONER SIGNATURE DATE 02/05/02 ☒ CONCUR ☐ DISSENT

COMMISSIONER SIGNATURE Sharon Lawin DATE 2/5/02 ☒ CONCUR ☐ DISSENT

COMMISSIONER SIGNATURE DATE 2-5-02 ☒ CONCUR ☐ DISSENT

I dissent from the majority for the following reasons:

SIGNATURE DATE

BPT 1139 (4/87)

STATE OF CALIFORNIA

**REVIEW OF PROPOSED ION**

☐ APPROVED ☐ REFER TO BOARD REVIEW COMMITTEE ☐ REFER TO RECONSIDERATION PANEL

INMATE: **BRODSKY, Clifford** CDC NUMBER: H-07665

TYPE OF HEARING: Initial parole consideration DATE OF HEARING: 12/05/01

The Decision Review Unit has completed a review of the above hearing and has identified the following issue which needs further review:

Review by the Decision Review Unit of the initial parole consideration hearing dated December 5, 2001, has disclosed that due to an apparent malfunction of the recording equipment, significant portions of the hearing, including the decision, are not transcribable.

Since a complete record of the hearing is not only required by law, but is also necessary for a review of the hearing decision, a rehearing of the prisoner's initial parole consideration hearing will be required.

**RECOMMENDATION: Disapprove the proposed December 5, 2001 hearing decision and schedule a rehearing on the next available calendar.**

DECISION REVIEW UNIT SIGNATURE: [signature] DATE: 2-4-02

REVIEWED BY LEGAL COUNSEL ☒ YES ☐ NO: LEGAL COUNSEL INITIALS: [initials] RESULT: ☒ CONCUR ☐ DISSENT

LEGAL COUNSEL COMMENTS:

I have reviewed the above-referenced file and ☒ concur ☐ dissent with the Decision Review Unit.
COMMENTS:

[signature]

EXECUTIVE OFFICER SIGNATURE: DATE: 2-4-02

Exhibit "C"

LOS ANGELES, CALIFORNIA

10:05 A.M. WEDNESDAY * JULY 10, 1991

DEPARTMENT NO. 111 HON. FREDERICK LOWER, JR., JUDGE

APPEARANCES:

Defendant with his counsel, RICHARD CHIER, Attorney at Law; WILLIAM HODGMAN, Deputy District Attorney of Los Angeles County, representing the People of the State of California.

(Emanuel J. Sanzo, Official Reporter.)

NOLO CONTENDERE PLEA %

THE COURT: People versus Brodsky, BA000576.

Mr. Brodsky is in court -- good morning, Mr. Brodsky -- with Mr. Chier, C-h-i-e-r, his attorney; the People are represented by Mr. Hodgman.

This matter is here for pretrial or plea.

MR. HODGMAN: That's correct, Your Honor.

Today is trial setting or a date for determining whether or not Mr. Brodsky wishes to enter a change of plea.

It is my understanding Mr. Brodsky wishes to enter a change of plea to the count.

If I may outline the general terms of the agreement or the settlement, I'll do that for the court.

THE COURT: All right.

MR. HODGMAN: Then I'll address Mr. Brodsky.

THE COURT: All right.

MR. HODGMAN: I have offered to counsel and his client that the defendant enter a plea to the count as charged with a stipulation by the People that this would be conspiracy to commit murder of the second degree, which would entail a sentence of 15 years to life in state prison rather than 25 to life as contemplated by the present charge.

I have indicated a couple of other things to counsel.

One, counsel requested August 15th as a P & S date in order to facilitate the presentation to this court and to later authorities within the Department of Corrections and the Board of Prison Terms a private probation report so that authorities on down the line would have a fuller view or perception of Mr. Brodsky.

In addition, I have told Mr. Chier, and I believe he has represented to his client, that on behalf of the District Attorney's Office my estimation of this case as trial lawyer would be that when the Board of Prison Terms sees fit to parole Mr. Brodsky I would agree with that determination, and that I would have no opposition to Mr. Brodsky being paroled at the first

date that the Board of Prison Terms determines to be suitable.

That would be contingent on a couple of things.

One, that Mr. Brodsky remain discipline free while within the Department of Corrections.

Secondly, that no violence occurs to any of the People's witnesses or potential witnesses that are presently involved with the case.

And I further represented to Mr. Chier that I'll place a memo in my file so that some years hence when a district attorney, if not myself, attends that lifer hearing, that this disposition as represented by the record is known and in the file and can be represented to the appropriate authorities at that time.

MR. CHIER: I would like to just clarify one aspect of that, Your Honor.

THE COURT: Yes, Mr. Chier.

MR. CHIER: With respect to the violence occurring to the witnesses in this case, I think it ought to be understood that violence occurring that would be in some way ascribable to him.

Mr. Pursely, who was previously a codefendant in this case and who has now found religion and given the People a statement, is going to be in state prison himself.

I don't know what jacket he's going to go to state prison with. And it may be that something

would happen to him which is in no way ascribable to the defendant, and might happen to him merely because of the nature of the individual.

And I don't want --

THE COURT: You are concerned that this stipulation is going to turn Mr. Brodsky into an insurer of the safety of certain individuals. Is that the idea?

MR. CHIER: Yes.

THE COURT: I don't think that's your intention.

MR. HODGMAN: That's not my intention.

I agree with Mr. Chier. It would only be any violence that through some means we can attribute to Mr. Brodsky.

If something happens completely unrelated to Mr. Brodsky or his actions, so be it, that should not cause anything negative to fall back upon Mr. Brodsky.

THE COURT: So there would have to be a causal link to Mr. Brodsky.

MR. CHIER: Yes.

MR. HODGMAN: Agreed.

With that, Your Honor, I'll outline the consequences of the plea for Mr. Brodsky and advise him of his constitutional rights.

THE COURT: You may take the plea.

MR. HODGMAN: Thank you.

Mr. Brodsky, as I have just indicated, I'm going to talk to you about a couple of things.

One is you should be fully aware of the

consequences of your plea today.

I know you have had lengthy discussions with your attorney, but here on the record it's important that we go through it once again.

In addition, I'm duty bound to advise you of certain constitutional rights that you now possess and that you will have to waive or give up so that this court can accept your plea.

If you have any questions with anything I'm about to discuss with you feel, free to interrupt me, speak to your lawyer, address the court or myself, and we will answer those questions for you.

Do you understand that, sir?

THE DEFENDANT: Yes.

THE COURT: Mr. Brodsky, it has been agreed between your counsel, myself, and acceptable to the court, that if you plead to the count of conspiracy to commit murder, with the stipulation that it is murder of the second degree, this carries with it a potential sentence of 15 years to life in the state prison.

This means you will not get probation; you will go to prison.

When you get out of prison you will be placed on parole. With an indeterminate sentence such as this your parole can last up to five years.

If while on parole you committed an act that was deemed a violation of your parole and your parole was revoked you could be returned to state prison

for up to 12 months for each independent violation and revocation of your parole.

Do you understand, first of all, the potential sentence as well as the parole consequences of this plea, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Very well.

Mr. Brodsky, you should also be aware if you are now on parole or if you are now on probation your plea today could result in a violation or revocation of your probation or parole.

I realize this may or may not apply -- to my knowledge it does not -- but at the same time for the record we should establish that you are aware that a violation of parole or probation as of today is a possible consequence.

Do you understand that, sir?

THE DEFENDANT: I understand. I'm not on parole or probation.

MR. HODGMAN: Very well.

In addition, here in California pursuant to the Government Code there is what is known as a government restitution fund.

As a consequence of your plea Judge Lower will impose upon you a fine to be paid into this fund of no less than $100 or more than $10,000.

Do you understand that as a possible consequence of your plea?

THE DEFENDANT: Yes.

MR. HODGMAN: You should also be aware, sir -- and I realize this may not apply in your case -- but if you are not a citizen of the United States your conviction in this case could result in your deportation from the United States, denial of reentry into the United States or your denial of naturalization pursuant to the laws of the United States.

Do you understand that as a possible consequence?

THE DEFENDANT: Yes, I understand. I am a citizen.

MR. HODGMAN: Very well.

Lastly, sir, you should be aware that this offense could be a priorable offense, meaning somewhere down the line -- I hope this would not occur, but after you paid your debt to society and resumed your status as a citizen, if you commit a new felony this present offense for which you will suffer a conviction could result in a prior felony allegation, which could enhance your penalty in any future case if you were convicted.

Do you understand that, sir?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: Okay.

Realizing all these potential consequences of your plea, sir, is it still your desire to enter a plea of guilty to the count as we have outlined here today?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: In order to do that, sir, you have to waive and give up certain constitutional rights. I'm going to discuss those with you now.

First of all, you have a right to a jury trial.

A jury trial is where your attorney and myself would select 12 people from the community.

They in effect would sit in judgment upon you. They would determine whether or not you were guilty of this charge.

Because you are pleading guilty you will not have an opportunity to have a jury trial.

Do you understand your right to have a jury trial, sir?

THE DEFENDANT: Yes.

MR. HODGMAN: Do you waive and give up that right?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: If your attorney and I agreed, we could proceed by way of a court trial.

That is, instead of a jury a judge alone would decide the case, he would determine whether you were guilty or not.

Because you are pleading guilty today you will not have an opportunity to have a court trial.

Do you understand your right to have a court trial, sir?

THE DEFENDANT: Yes, I do.

MR. HODGMAN: And you do waive and give up that right?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: If we were to have a trial, Mr. Brodsky, you would have the right to confront and cross-examine witnesses.

This means that you would have the right to be present in court and to face or confront the witnesses that I would call to testify against you.

Through your attorney you would have the right to question those witnesses. That's known as cross-examination.

Because you are pleading guilty today you will not have an opportunity to exercise this right to confront and cross-examine witnesses.

Do you understand that right, sir?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: And do you waive and give up that right?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: You also have a right, Mr. Brodsky, to present evidence in your own behalf.

This means that you can utilize the court subpoena power, if you wish, to have witnesses brought into court to testify for you.

In addition, you could testify in your own behalf if you felt that was in your own best interest.

Because you are pleading guilty today you will not have an opportunity to exercise that right.

Do you understand your right to present evidence in your own behalf?

THE DEFENDANT: Yes, I do.

MR. HODGMAN: And this is specifically with regard to the issue of guilt or lack thereof.

THE DEFENDANT: Yes, sir.

MR. HODGMAN: Do you waive and give up that right, sir?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: Lastly, Mr. Brodsky, you have a right which is known as the privilege against self-incrimination.

This means you have a right not to be a witness against yourself and not to incriminate yourself.

By virtue of your plea today in effect you are incriminating yourself because Judge Lower will be using this plea as a basis for sentencing you in roughly one month hence.

Do you understand your privilege against self-incrimination sir?

THE DEFENDANT: Yes, I do.

MR. HODGMAN: Do you waive and give up that privilege?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: Mr. Brodsky, has anybody threatened

you or anyone close to you to make you plead guilty today?

THE DEFENDANT: No, sir.

MR. HODGMAN: Has anybody promised you anything by way of reward, leniency, or the like, other than what we have discussed here in open court by way of case settlement, to make you plead guilty today?

THE DEFENDANT: No, sir.

MR. HODGMAN: And are you pleading guilty, then, today because that's what you freely and voluntarily want to do today?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: Very well.

What I am going to do, Mr. Brodsky, is basically sort of recite the charge and ask you whether or not these circumstances are true, and then I'll ask you for your plea.

MR. CHIER: Could we just stipulate to a factual basis rather than have some sort of specific allocution in light of the fact that there are civil cases pending against Mr. Brodsky, he's in litigation arising out of this same incident.

MR. HODGMAN: That's agreeable.

Counsel, do you stipulate that the preliminary hearing transcript may be used as a factual basis for this plea?

MR. CHIER: Yes.

MR. HODGMAN: Mr. Brodsky, do you join in that?

THE DEFENDANT: Yes, sir.

MR. HODGMAN: Very well.

Mr. Brodsky, to Count 1, which is charged in information number BA000576, that is, conspiracy to commit murder of the second degree, how do you now plead?

(Counsel confers with defendant.)

THE CLERK: 182.1?

MR. HODGMAN: Yes. 182.1/187 second degree would be most accurate.

THE DEFENDANT: No contest.

MR. CHIER: Is that okay with you?

THE DEFENDANT: Or guilty.

MR. CHIER: It doesn't mean anything.

MR. HODGMAN: A no contest plea would be acceptable.

Let me advise you on that, though.

Mr. Brodsky, a no contest plea for purposes of this court and for purposes of sentencing is the same as a guilty plea.

Your attorney has discussed with you that there may be some ramifications in other areas of litigation, and where it might be beneficial to you.

That may or may not be true necessarily. But for purposes of this plea the People will accept a no contest plea.

And your plea, then, to the charge as indicated is no contest, then?

THE DEFENDANT: No contest.

MR. HODGMAN: Very well.

Counsel, join in the plea and waivers?

MR. CHIER: Yes, counsel.

THE COURT: The court finds that the defendant has knowingly, voluntarily and with understanding given up his constitutional rights.

I find also that the plea is made freely and voluntarily with an understanding of the nature and consequences thereof.

I further find, having read the preliminary hearing transcript, that there is a factual basis for the plea. And the court accepts the plea.

Now, Mr. Brodsky, you have a right to be sentenced within 20 court days of today. Your counsel has asked the matter go over to August the 15th for a probation and sentence hearing.

Do you give up your right to be sentenced within 20 court days so that it can go over to August 15th?

THE DEFENDANT: Yes, sir.

THE COURT: I understand, Mr. Chier, you are going to supply a private probation report.

MR. CHIER: Yes, Your Honor.

THE COURT: What about the regular probation and sentencing report from the probation department? Do you

waive that, or do you want me to order one of those as well?

MR. HODGMAN: Your Honor, the People would request that one be ordered. I know from the standpoint of the Department of Corrections that --

THE COURT: They want that.

MR. HODGMAN: -- they desire that as well.

THE COURT: All right.

Then, the court will order a P & S report from the probation department.

And then, Mr. Chier, if you are going to supply a separate one, I would ask that it be received, so I can go over the material by the 5th of August.

MR. CHIER: The 5th of August?

THE COURT: Yes.

MR. CHIER: That might be a little soon, Your Honor.

THE COURT: How about the 8th?

MR. CHIER: The 8th would be better for us.

THE COURT: All right.

MR. HOGMAN: I'll ask a courtesy copy be forwarded to my office as well.

MR. CHIER: I will.

THE COURT: Then, Mr. Brodsky, you are ordered to return to this courtroom on August 15th at 8:30 without a subpoena or further order of court.

Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right.

THE CLERK: Here is a card.

MR. HODGMAN: Thank you, Your Honor.

THE COURT: You're welcome.

Mr. Brodsky, before you go you are also ordered to report to the probation department for an interview so they can fill out the report.

THE DEFENDANT: Yes, Your Honor

(Proceedings concluded.)

LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 23, 1991

10:27 A.M.

DEPARTMENT 111 HON. FREDERICK J. LOWER, JUDGE

APPEARANCES:

THE DEFENDANT BEING PRESENT AND IN COURT AND REPRESENTED BY COUNSEL, RICHARD CHIER, ESQUIRE; THE PEOPLE BEING REPRESENTED BY WILLIAM HODGMAN, DEPUTY DISTRICT ATTORNEY OF LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:

(YVONNE GALLEGOS, OFFICIAL REPORTER, CSR NO. 7521.)

THE COURT: PEOPLE VERSUS BRODSKY. BEFORE WE PROCEED, MR. BRODSKY IS ON BAIL.

MR. CHIER: YES, YOUR HONOR.

THE COURT: AND YOU WERE SAYING THE LAST TIME THIS CASE WAS HERE THAT YOU WANTED TO MAKE SOME ARRANGEMENTS WITH REGARD TO A SURRENDER AT A PRISON.

MR. CHIER: CHINO. AND I HAVE -- IT IS QUITE SIMPLE ACTUALLY. MR. HODGMAN IS UNOPPOSED TO IT.

IT INVOLVES -- YOUR HONOR HAS TO MAKE TWO ORDERS AND A COMMITMENT ORDER AND A SURRENDER OR GATE TURN-IN ORDER.

THE COMMITMENT ORDER WOULD COMMIT HIM TO THE DEPARTMENT OF CORRECTIONS AT CHINO. AND THE GATE TURN-IN ORDER MERELY ORDERS THE DEFENDANT TO TURN HIMSELF IN AT

10:00 A.M. ON FRIDAY OF NEXT WHICH WILL BE THE 30TH AT THE CALIFORNIA INSTITUTE FOR MEN NORTH FACILITY.

THE COURT: WHERE IS THAT? CHINO?

MR. CHIER: CHINO, CALIFORNIA.

THE COURT: OKAY.

MR. CHIER: THE CLERK IS TO SEND THE STATE PRISON PACKAGE AHEAD SO THAT -- MR. BRODSKY HAS TO COME BACK SOMETIME NEXT WEEK AND GET A CERTIFIED COPY OF THE MINUTE ORDER AND THE COMMITMENT ORDER. THEN THE CLERK IN THE MEANTIME HAS TO SEND THE STUFF ALONG AS SHE WOULD ORDINARILY DO.

BUT IN THIS CASE I AM ASKING THAT THE CLERK INCLUDE A COPY THAT I HAVE PROVIDED HER OF THE PRIVATE PRESENTENCE REPORT THAT WAS DELIVERED TO THE COURT YESTERDAY.

THE CONTACT AT THE DEPARTMENT OF CORRECTIONS FOR ALL OF THIS IS A WOMAN BY THE NAME OF PAMELA JOHNSON WHO IS IN CENTRAL RECORDS AND HER EXTENSION NUMBER IS 2442. AND SHE INDICATES THAT IF THE DEFENDANT HAS HIS OWN COPY OF THE ORDER AND THEY HAVE ALREADY RECEIVED THIS PACKAGE FROM THE COURT, THEY WILL ACCEPT HIM AT A TIME DESIGNATED BY YOUR HONOR.

WE HAVE JUST SELECTED THAT DATE TO ALLOW ENOUGH REAL TIME FOR THE PAPERS TO GET THERE AHEAD OF MR. BRODSKY AND FOR MR. BRODSKY TO PROVIDE THEM WITH A COPY AS HE NEEDS TO TURN IN AT THE GATE.

THE COURT: DO YOU THINK REALISTICALLY THAT THEY CAN GET THERE THAT FAST?

THE CLERK: I DON'T.

MR. HODGMAN: I HAVE THAT CONCERN AS WELL. I WAS GOING TO RECOMMEND UTILIZING OVERNIGHT MAIL IF THAT IS ACCEPTABLE TO THE CLERK AND THE COURT. I THINK THERE IS A PROBLEM WITH DEFERRING THE ULTIMATE SURRENDER DATE TOO LONG.

I THINK AS A MATTER FOR MR. BRODSKY'S OWN STATE OF MIND AND IT IS JUST OUT OF A CONCERN OF DEFERRING ULTIMATE SENTENCING TOO LONG ANYWAY.

I WISH TO ADD THAT I SPOKE WITH MR. CHIER EARLIER IN THE WEEK. HE INDICATED HE WOULD LOOK INTO THIS PROCEDURE. I ASKED HIM TO INFORM ME OF THE PROCEDURE SO THAT I COULD ATTEMPT TO VERIFY IT ON MY OWN BEFORE TODAY'S DATE. I DID NOT GET THAT INFORMATION UNTIL THIS MORNING AND I HAVE NOT VERIFIED IT.

I WILL STATE THAT I KNOW GENERALLY AND FROM PAST EXPERIENCE THAT THERE IS A PROCEDURE SUCH AS MR. CHIER HAS SUGGESTED. IT SOUNDS FROM WHAT I RECALL TO THE COURT PERFECTLY WITH THE PROCEDURE IN THE PAST.

THE COURT'S CONCERN ABOUT THE PAPER WORK GETTING THERE ON TIME IS LEGITIMATE BECAUSE THE RECORD KEEPING ASPECT OUT AT CHINO IS JUST A MASSIVE PROJECT.

I HAVE NO OBJECTION TO MR. BRODSKY SURRENDERING HIMSELF AT 10 A.M. OR BEFOREHAND A WEEK FROM TODAY.

I WOULD RECOMMEND THAT THE OVERNIGHT MAIL PROCEDURE BE UTILIZED AND I WOULD FURTHER STATE THAT SHORTLY AFTER 10 A.M. NEXT FRIDAY, EITHER MYSELF OR ONE OF

MY DESIGNATES WOULD BE CALLING THE PRISON TO MAKE SURE MR. BRODSKY IS THERE AND SURRENDERED. IF HE HAS NOT, HE WILL BE RETURNING TO THIS COURT IMMEDIATELY TO US FOR A WARRANT AND FOR BAIL TO BE FORFEITED.

MR. CHIER: THERE IS A SUBSTANTIAL BAIL IN THIS CASE.

THE COURT: THAT IS MY NEXT QUESTION. AT WHAT PROCEEDING WOULD THE BAIL BE EXONERATED?

MR. CHIER: UPON VERIFICATION THAT MR. BRODSKY IS IN PRISON.

THE COURT: ALL RIGHT.

MR. CHIER: I DON'T WANT TO SPEAK FOR MR. HODGMAN HERE.

MR. HODGMAN: WE WILL NOT RELEASE THE BAIL ASPECT UNTIL WE KNOW MR. BRODSKY IS WHERE HE WANTS TO BE.

THE COURT: OFF THE RECORD.

(A DISCUSSION WAS HELD OFF THE RECORD.)

THE COURT: THIS IS THE DATE FOR HEARING REGARDING PROBATION AND PRONOUNCEMENT OF SENTENCE.

THE COURT HAS READ AND CONSIDERED THE PROBATION OFFICER'S REPORT, THE DEFENDANT'S WRITTEN STATEMENT, LETTERS FROM ROBERT BACK (PHONETIC), BARBARA BELL (PHONETIC), ATTORNEY LAWRENCE WEISSMAN AND MOST RECENTLY A PACKET OF MATERIALS SUBMITTED FROM STEPHEN WISHNY, W-I-S-H-N-Y, ASSOCIATES. IT WAS DELIVERED TO THE COURT YESTERDAY.

ANY LEGAL CAUSE -- WAIVE ARRAIGNMENT FOR JUDGMENT AND SENTENCE?

MR. CHIER: YES, YOUR HONOR.

THE COURT: ANY LEGAL CAUSE WHY JUDGMENT SHOULD NOT NOW BE IMPOSED?

(NO RESPONSE)

THE COURT: ANY COMMENTS FROM THE DEFENSE OR THE PEOPLE?

MR. CHIER: ON BEHALF OF THE DEFENDANT, UNLESS YOUR HONOR IS INCLINED TO REFER THE MAN TO THE DEPARTMENT OF CORRECTIONS FOR A 1203.03 WHICH I DON'T THINK YOU ARE, WE WOULD SUBMIT IT.

THE COURT: VERY WELL. PEOPLE?

MR. HODGMAN: OBVIOUSLY 1203.03 WAS NOT PART OF THE CASE SETTLEMENT IN THIS CASE. I WOULD DISCOURAGE THAT.

OTHER THAN THAT, I WOULD STATE THAT I AM IN RECEIPT OF THE PRIVATE PROBATION REPORT. I DO CONCUR IN ITS INCLUSION IN THE COURT'S RECORDS FOR PURPOSES OF SENDING TO THE DEPARTMENT OF CORRECTIONS AND THE BOARD OF PRISON TERMS.

I WOULD NOTE THAT THERE IS A SOME STATEMENT AS TO HOW THIS ALL BEGAN OUT OF "BLACK HUMOR."

I WOULD STATE FOR THE RECORD AS I DID AT ONE OF THE EARLIER BAIL PROCEEDINGS IN THIS CASE PRIOR TO THE PRELIMINARY HEARING IS THAT BUT FOR FORTUNATE CIRCUMSTANCES

WE COULD BE STANDING HERE ADDRESSING SENTENCING FOR THE MURDER OF A MAN WHO HAS A FAMILY AS WELL WITH SPECIAL CIRCUMSTANCES. A STATUTE IN THE SENTENCING CONSIDERATION WOULD BE MORE ALONG THE LINE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE AND CONCEIVABLY THE DEATH PENALTY. SO THIS IS A SERIOUS MATTER.

I NOTE AND AM ENCOURAGED FROM THE PRIVATE PROBATION REPORT THAT MR. BRODSKY ACKOWLEDGED HIS GUILT; THAT HE EXPRESSES REMORSE FOR WHAT HE HAS DONE. I THINK IT EXHIBITS MATURITY ON HIS PART THAT HE ACCEPTS THE NEEDS OF PUNISHMENT IN LIGHT OF HIS WRONGDOING.

THE PRIVATE PROBATION REPORT REQUESTS ACCESS TO TREATMENT. I CAN'T SPEAK WITH CERTAINTY AS TO WHICH FACILITY HE WILL END UP AT. I WOULD SUSPECT IT MIGHT BE SOMETHING ALONG THE LINES OF THE INSTITUTION AT SAN LUIS OBISPO. AND FROM HAVING PARTICIPATED, I KNOW THAT THEY HAVE AN EXTENSIVE TREATMENT PROGRAM FOR A WHOLE VARIETY OF THINGS AS WELL AS EDUCATIONAL PROGRAMS. MIGHT BE A GOOD PLACE FOR HIM TO GO.

I WOULD LASTLY STATE AS I STATED BEFORE, AND WISH TO MAKE A MATTER OF RECORD, THAT WHAT THIS PRIVATE PROBATION REPORT INCLUDES DOES NOT SURPRISE ME.

I THINK MR. BRODSKY SHOULD BE FAIRLY PUNISHED FOR WHAT HE HAS DONE. AND I WOULD STATE AS I DID ONCE BEFORE THAT I WOULD NOT OPPOSE HIS RELEASE AT THE FIRST AVAILABLE OPPORTUNITY UPON CONSIDERATION AND AFTER CONSIDERATION BY THE BOARD OF PRISON TERMS PROVIDED THAT THERE IS NO COMPETENT EVIDENCE WHICH CONNECTS MR. BRODSKY

WITH ANY HARM IF THAT INDEED OCCURS. THERE HAS BEEN SOME SUGGESTION OF THAT.

WITH THAT, YOUR HONOR, I HAVE NOTHING FURTHER TO SAY.

THE COURT: VERY WELL. IS THERE ANYTHING FURTHER?

MR. CHIER: NO.

MR. HODGMAN: NO.

THE COURT: I HAVE CONSIDERED THE FACTORS SPECIFIED UNDER RULE 414 OF THE CALIFORNIA RULES OF COURT. AND I FIND THE FOLLOWING FACTORS SUPPORT THE DENIAL OF PROBATION IN THIS MATTER.

FIRST OF ALL, THE AGREEMENT OF THE PARTIES IN REACHING THE DISPOSITION. BUT, SECONDLY, THE NATURE AND SERIOUSNESS OF THE CRIME, MAINLY CONSPIRACY TO COMMIT MURDER; THE FACT THAT THE DEFENDANT WAS AN ACTIVE PARTICIPANT.

THE COURT HAVING DENIED PROBATION, IT IS THE JUDGMENT OF THE COURT THAT MR. BRODSKY BE COMMITED TO THE DEPARTMENT OF CORRECTIONS FOR THE TERM PRESCRIBED BY LAW 15 YEARS TO LIFE FOR VIOLATION OF PENAL CODE 182.1/187, SECOND DEGREE.

HE IS GIVEN CREDIT FOR 25 DAYS ACTUALLY SERVED AND 12 DAYS GOOD TIME WORK TIME FOR A TOTAL CREDIT OF 37 DAYS.

THE LAW WILL PERMIT AN AWARD OF CONDUCT AND WORK TIME CREDIT. THAT WILL BE DETERMINED BY THE DEPARTMENT OF CORRECTIONS.

MR. BRODSKY, YOU ARE ADVISED IF PAROLE IS GRANTED UPON YOUR RELEASE FROM PRISON, YOU WILL BE PLACED ON PAROLE FOR LIFE.

THE COURT ORDERS THE DEFENDANT, MR BRODSKY, TO BE COMMITTED TO THE DEPARTMENT OF CORRECTIONS FACILITY IN CHINO, THE CALIFORNIA INSTITUTE FOR MEN. AND THAT HE SURRENDER HIMSELF AT THE GATE NO LATER THAN 10 A.M., FRIDAY, AUGUST 30TH AT THAT LOCATION.

BAIL WILL STAND UNTIL THE COURT IS NOTIFIED THAT MR. BRODSKY HAS APPEARED AND THEN RECEIVED AT THE FACILITY.

MR. HODGMAN: YOUR HONOR, IN THAT REGARD WHAT I INTEND TO DO IS BY TELEPHONE EITHER PERSONALLY OR BY A DESIGNATE CALL CHINO NEXT FRIDAY AND MAKE SURE MR. BRODSKY IS THERE.

I WILL ASK THEM TO FAX A COPY TO THE LOS ANGELES POLICE DEPARTMENT OF MR. BRODSKY'S FINGERPRINTS WHICH THEY WILL TAKE UPON INTAKE THERE. AND UPON BEING SATISFIED THAT MR. BRODSKY IS INDEED THERE AND HAS BEEN PROCESSED, I WILL NOTIFY MR. CHIER AND THE COURT FOR PURPOSES OF EXONERATION OF BAIL.

THE COURT: OKAY. UPON RECEIPT OF THAT EVIDENCE THEN, THE BAIL WILL BE EXONERATED.

MR. BRODSKY, I HAVE READ, AS I SAID AT THE OUTSET, ALL THE MATERIAL THAT HAS BEEN SUBMITTED. AND OBVIOUSLY THIS HAS BEEN A VERY -- IS A VERY SERIOUS AFFAIR. HOWEVER, DESPITE WHAT YOU'RE FACING IT SEEMS TO ME THAT THERE IS CONSIDERABLE CAUSE FOR HOPE THAT WITH

APPROPRIATE COUNSELING YOU CAN TURN THINGS AROUND AND COME BACK OUT IN DUE COURSE AND BECOME A PRODUCTIVE MEMBER OF SOCIETY.

I URGE YOU TO FOCUS ON THAT AS YOU WILL EMBARK UPON THIS CASE. I WANT TO WISH YOU THE VERY BEST OF LUCK.

THE DEFENDANT: THANK YOU, YOUR HONOR.

THE COURT: ALL RIGHT. ANYTHING FURTHER?

MR. CHIER: NOTHING FURTHER, YOUR HONOR.

MR. HODGMAN: NOTHING, YOUR HONOR. THANK YOU.

(PROCEEDINGS CONCLUDED.)

Exhibit "D"

1031 BK M3375 PG 447

RECORDING REQUESTED BY AND MAIL TO

NAME CLIFFORD BRODSKY

STREET 602 HERMOSA AVE

CITY & STATE HERMOSA BEACH, CAL. 90254

RECORDED IN OFFICIAL RECORDS OF LOS ANGELES COUNTY, CALIF.

19 Min. Past 11 A.M. DEC 26 1969

RAY E. LEE, Registrar-Recorder

FREE 1 R

*THIS IS AN IMPORTANT RECORD SAFEGUARD IT.*

**PERSONAL DATA**

1. LAST NAME - FIRST NAME - MIDDLE NAME: BRODSKY, Clifford NMN
2. SERVICE NUMBER: 697631
3. SOCIAL SECURITY NUMBER: 197 | 32 | 5343
4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS: NAVY - USNR
5a. GRADE, RATE OR RANK: LTJG
b. PAY GRADE: O-2
6. DATE OF RANK: DAY 13 MONTH FEB YEAR 1967
7. U. S. CITIZEN: [X] YES [ ] NO
8. PLACE OF BIRTH (City and State or Country): Lakehurst, New Jersey
9. DATE OF BIRTH: DAY 13 MONTH AUG YEAR 1943

**SELECTIVE SERVICE DATA**

10a. SELECTIVE SERVICE NUMBER: 36 | 127 | 43 | 539
b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY, STATE AND ZIP CODE: LB #127, Philadelphia, Pennsylvannia
c. DATE INDUCTED: DAY NA MONTH YEAR

**TRANSFER OR DISCHARGE DATA**

11a. TYPE OF TRANSFER OR DISCHARGE: Released from Active Duty Commitment
b. STATION OR INSTALLATION AT WHICH EFFECTED: USS YORKTOWN (CVS-10)
c. REASON AND AUTHORITY: BUPERS Order 106884, 611, Expiration of active duty commitment.
d. EFFECTIVE DATE: DAY 15 MONTH JULY YEAR 1968
12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND: USSSYORKTOWN (CVS-10)
13a. CHARACTER OF SERVICE: HONORABLE
b. TYPE OF CERTIFICATE ISSUED: SEE REMARKS
14. DISTRICT, AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED: Naval Reserve Manpower Center, Bainbridge, Maryland
15. REENLISTMENT CODE: NA

**SERVICE DATA**

16. TERMINAL DATE OF RESERVE/UMT&S OBLIGATION: DAY MONTH NONE YEAR
17. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION
a. SOURCE OF ENTRY: [ ] ENLISTED (First Enlistment) [ ] ENLISTED (Prior Service) [ ] REENLISTED [X] OTHER Commissioned: 13 AUG 1965
b. TERM OF SERVICE (Years): INDEF
c. DATE OF ENTRY: DAY 13 MONTH AUG YEAR 1965
18. PRIOR REGULAR ENLISTMENTS: 1
19. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SVC: Ensign
20. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State): Pensacola, Florida
21. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County, State and ZIP Code): 1249 Gilham Street Philadelphia, Pennsylvannia
23a. SPECIALTY NUMBER & TITLE: Administrative Officer
b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER: 0-97.12

| 22. STATEMENT OF SERVICE | | YEARS | MONTHS | DAYS |
|---|---|---|---|---|
| a. CREDITABLE FOR BASIC PAY PURPOSES | (1) NET SERVICE THIS PERIOD | 02 | 11 | 02 |
| | (2) OTHER SERVICE | 03 | 04 | 22 |
| | (3) TOTAL (Line (1) plus Line (2)) | 06 | 03 | 24 |
| b. TOTAL ACTIVE SERVICE | | 04 | 05 | 07 |
| c. FOREIGN AND/OR SEA SERVICE | | 02 | 11 | 02 |

24. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED: National Defense Service Medal, Viet Nam Service Medal (w/3 Bronze Stars), and Republic of Viet Nam Campaign Medal (w/Device 1960-)

25. EDUCATION AND TRAINING COMPLETED:
FTC, San Diego, California, 13 NOV to 1 DEC 67; Prospective Officer of the Deck.
FAWTC, San Diego, California, 5 JUL to 7 JUL 67; Electronic Countermeasures.

**VA AND EMP. SERVICE DATA**

26a. NON-PAY PERIODS/TIME LOST (Preceding Two Years): TL-NONE EXLV-NONE
b. DAYS ACCRUED LEAVE PAID: FIFTY EIGHT (58)
27a. INSURANCE IN FORCE (NSLI or USGLI): [ ] YES [X] NO
b. AMOUNT OF ALLOTMENT: $ NA
c. MONTH ALLOTMENT DISCONTINUED: NA
28. VA CLAIM NUMBER: C- NONE
29. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE: [X] $10,000 [ ] $5,000 [ ] NONE

**REMARKS**

30. REMARKS:
College-4
Block 13b continued: No Discharge Certificate issued at time of separation.
X X X X X X
X X X X X X
X X X X X X

**AUTHENTICATION**

31. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County, State and ZIP Code): 1249 Gilham Street Philadelphia 11, Pennsylvannia
32. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED: C Brodsky
33. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER: R. W. LAWTON, CWO-2, USN Ship's Secretary
34. SIGNATURE OF OFFICER AUTHORIZED TO SIGN: R.W. Lawton

DD FORM 1 JUL 66 214 N — PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE. S/N-0101-800-4301

ARMED FORCES OF THE UNITED STATES REPORT OF TRANSFER OR DISCHARGE

1

1031

Exhibit "E"

# PSYCHOLOGICAL EVALUATION
# FOR THE BOARD OF PAROLE HEARINGS
# REVISED AUGUST 2006
# PAROLE CONSIDERATION HEARING
# SEPTEMBER 2006 LIFE TERM INMATE CALENDAR

## CORRECTIONAL TRAINING FACILITY-SOLEDAD
## August 25, 2006

This is the fourth psychological evaluation for the Board of Parole Hearings on inmate Clifford Brodsky, CDC# H-07665. This report is the product of a personal interview as well as a review of his central file and unit health record. This interview was a single contact for the sole purpose of preparing this report.

## I. IDENTIFYING INFORMATION:

Brodsky is a 63-year-old, married, white first-termer serving a 15-year-to-life sentence for Conspiracy to Commit Murder in the Second Degree. His date of birth is August 13, 1943. His stated religion is Jewish. There no unusual physical characteristics noted and he denied any history of nicknames or aliases.

## II. DEVELOPMENTAL HISTORY:

He had no prenatal or perinatal concerns, birth defects, abnormalities of developmental milestones, history of cruelty to animals, enuresis, arson or a history of physical or sexual abuse, either as a perpetrator or a victim.

## III. EDUCATION:

He has a BS degree in education with a Master's degree in Administration. In prison, he has worked in textiles and as a teacher's aide. He is currently the Captain's clerk. He receives excellent work reports. He has completed mechanical drafting. He has completed numerous workshops in recent years.

## IV. FAMILY HISTORY:

Both of his parents are deceased. He has one sister with whom he has minimal contact. He enjoyed good relationships with all of his family members. None of his family members have ever had any criminal or substance abuse problems.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He says he is a heterosexual male with no history of high-risk behavior or sexual aggression.

## VI. MARITAL HISTORY:

Brodsky is currently married to his second wife. He has a daughter from his first marriage as well as a son and stepchildren from his current marriage. He has regular contact with his children and wife.

## VII. MILITARY HISTORY:

Brodsky was in the U.S. Navy for four years. He served two terms in Vietnam and was involved in search-and-rescue. He received an Honorable Discharge.

## VIII. EMPLOYMENT/INCOME HISTORY:

He was the executive officer for a company that made ladies' undergarments and apparel. Prior to that, he worked in the information systems field. If paroled, he will work in the retail business with family members who own retail outlets.

## IX. SUBSTANCE ABUSE HISTORY:

He denied any illegal drug use. He acknowledged drinking wine and beer but said he did not have a drinking problem. He has attended AA and Millati Islami, which is the Muslim substance abuse program. At other institutions, he has attended classes on Addiction Recovery and Codependency and Addiction.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

He has a history of colitis and had a cyst removed from his leg. He currently does not have any significant medical problems and does not take any medication. He denies a history of head injuries, suicidal behavior, seizures or other neurological conditions.

## XI. PLANS IF GRANTED RELEASE:

If paroled, he plans to live with his daughter and work in a family retail business. His prognosis for successful, responsible, legal, prosocial community adjustment is excellent.

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

He exhibited no depressive or psychotic symptomatology. His intellectual functioning was estimated to be in the average range. He was calm, cooperative and alert. His mood, affect and flow of thought were all normal. His insight and judgment were good. He is not currently in need of any mental health treatment.

**CURRENT DIAGNOSTIC IMPRESSIONS:**

| | |
|---|---|
| AXIS I: | Adult Antisocial Behavior |
| AXIS II: | None |
| AXIS III: | None |
| AXIS IV: | Incarceration |
| AXIS V: | GAF=90 |

The prognosis for him maintaining his current mental status is good.

**XIII. REVIEW OF LIFE CRIME:**

He essentially agreed with the account of his crime as found in his central file. He takes full responsibility for his crime, saying, "It was my fault. I should've walked away but I didn't. I am responsible for it and believe I should be punished." He is grateful that no physical harm occurred and acknowledges the harm he has caused the victim, his family, and his own family. He expressed genuine remorse and regret for his crime.

**XIV. ASSESSMENT OF DANGEROUSNESS:**

Within a controlled setting, his violence potential is obviously lower than average due to his clean disciplinary record. If released to the community, his violence potential is lower than average due to his excellent institutional adjustment, long past history of prosocial behavior, the fact that his sentencing judge released a man facing life in prison out on bail without restrictions and a lack of a drug/alcohol problem.

A 2003 BPT document asks that a psychological evaluator address the question of "the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes." This evaluator believes the primary "underlying cause" for the offense was greed. However, past BPT evaluations note that Brodsky may also be driven by a fear of looking incompetent, a drive to succeed and annoyance at those who fail. If one assumes that these values or beliefs are central to his character, these values account for much of the responsibility and success in his life. However, if it is true that these values led him to the commitment offense, this is an example of an otherwise helpful belief system taken to its harmful extreme. The underlying causes of this belief system are probably good parenting and good personal responsibility. If paroled, the good part of these values will obviously help him. Is it likely these generally helpful, generally prosocial values will again manifest themselves in an illegal, harmful manner? No, based on the totality of his life.

A 2005 BPT Decision requests that the next psychological evaluator address issues regarding the statements "made in 1991 in that psych evaluation that was related to post-traumatic stress order (sic), because those issues just sort of went away without really being addressed. And in particular, the fact that the doctor at the time indicated that he felt that Mr. Brodsky was a ticking time bomb...There was a lot of stuff going on in that report that just got ignored in the future." A 1994 BPT psychological evaluator twice

noted that she believed Brodsky was not experiencing current symptoms of Post Traumatic Stress Disorder and that the instant offense was an isolated incident. That BPT evaluator also believed that Brodsky "seems to have explored the committed offense and has come to terms in part with its underlying causes."

The 1991 evaluation was completed at the request of Brodsky's attorney and was submitted in an attempt at mitigation. With all due respect to Brodsky's 1991 evaluator, even if Brodsky's symptoms at the time rose to the level of being diagnosable, it is not true that "full recovery from PTSD is possible...only when the patient receives intensive treatment." Brodsky has never received such treatment and there is no evidence whatsoever in his file that he ever again displayed PTSD-like symptoms. Also, after all this time, it is clear that Brodsky is not a "ticking time bomb." He is a better candidate for parole than almost all inmates. There are no obvious or subtle significant risk factors and precursors to violence.

**XV. CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

He is competent and responsible for his behavior and has the capacity to abide by institutional standards and has generally done so during his incarceration. He does not have a mental health disorder that would necessitate treatment either while incarcerated or on parole. Mandatory conditions of parole and recommendations include monitoring for substance abuse, attendance in any sort of self-help or self-improvement program and, obviously, employment. Parole decisions should be based on custody factors.

W.K. Marek, Ph.D.
Psychologist
Correctional Training Facility-Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility-Soledad

Inmate Copy

*PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS*
*(REVISED AUGUST 1998)*
*PAROLE CONSIDERATION HEARING*
*APRIL 2005 LIFER CALENDAR*

*CORRECTIONAL TRAINING FACILITY, SOLEDAD*
*APRIL 16, 2005*

Inmate Clifford Brodsky is a 61-year-old (date of birth: 08/13/43), first term, Caucasian male who is serving his thirteenth year of a 15-year-to-life sentence for conspiracy to commit second degree murder. He pled guilty on 07/10/91. The date of the offense was in July 1989. His MEPD is 08/05/01.

This evaluation is based upon two interviews, plus review of the central file and medical file.

The previous psychosocial assessment by Dr. Terrini is still current and valid. Therefore, the psychosocial information will not be repeated at this time.

The only significant change is that inmate Brodsky's parents are both deceased.

## *CLINICAL ASSESSMENT*

### *CURRENT MENTAL STATUS/TREATMENT NEEDS:*

Inmate Brodsky related in a serious, business-like, calm manner. His hygiene and grooming were appropriate. His thinking was logical, coherent, and goal-oriented. His speech was soft and calm. His affect was appropriate. There was no evidence of anxiety or depression. There was no indication of antisocial thinking or values. Intellectually, he is functioning in the high average range. There is no evidence of psychopathology in this case. His judgment is intact. His self-awareness and insight into the commitment offense is good.

Inmate Brodsky has participated extensively in numerous self-help projects. He participates at least annually in anger management classes. Although he has never had a drug use or alcohol abuse problem, he has also attended Alcoholics Anonymous. He has attended rational thinking groups, ethics groups, and lifer groups.

Inmate Brodsky has remained entirely disciplinary-free. This is a significant achievement.

### *CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):*

*AXIS I:* No contributory clinical disorder.
*AXIS II:* No contributory personality disorder.

*AXIS III:* No contributory physical disorder.
*AXIS IV:* Life-term incarceration.
*AXIS V:* Current GAF = 90.

The prognosis of being able to maintain current excellent adjustment and self-control if released to the community is good.

## XIII. REVIEW OF LIFE CRIME:

Inmate Brodsky was the CEO of a corporation that agreed to sell a subsidiary of the business to an associate if they would repay the 1.1 million dollars used to set up that company. A dispute arose, and the buyer refused to make payments. Inmate Brodsky stated that his feelings at the time were anger, despair, and fear of looking incompetent if this deal failed. He felt his status as a CEO was threatened. At that point in his life, this assault to his ego and pride caused him to react in an irrational, irresponsible manner. He admitted to attempting to recover the loan by having the victim murdered so that they could have the proceeds of a key-man life insurance policy securing that debt. This was discovered before anything happened. Inmate Brodsky stated that at that time he was irrational and was using extremely poor judgment. His actions were completely out of character. Basically, he was functioning beyond his capacities and out of his experience zone. He never denied responsibility for his wrongdoing. He accepted the district attorney's offer to plead guilty to conspiracy to commit second degree murder. He was then released on a post-conviction and post-sentencing bail without restrictions on the condition that he surrender himself to the Department of Corrections at the Chino Reception Center. This unusual action was done because the judge did not see him as a threat.

Inmate Brodsky has grown, aged, and matured over the 13 years of incarceration. His earlier feelings of ego and importance as a CEO have disappeared. He no longer holds any feelings of anger or resentment.

Inmate Brodsky has participated extensively in anger management classes. He stated that while in prison, he has learned to resolve conflicts, confrontations, and threats to himself in a rational manner. This is quite evident in that he has remained entirely disciplinary-free, something that is a significant achievement when living in a population with numbers of angry, hostile, confrontational inmates.

Inmate Brodsky repeated several times that he is totally responsible for his actions and behavior. He deeply regrets engaging in this offense and the subsequent trauma he has caused the victim and his family. He repeated several times that he is just very thankful that no one was actually hurt in a physical way. His feelings of remorse appear to be quite sincere and genuine.

## *XIV. ASSESSMENT OF DANGEROUSNESS:*

*A.* In considering the potential for dangerous behavior within the institution, inmate Brodsky has remained disciplinary-free. He has no history of violent behavior in the community. He has matured considerably since the time of the commitment offense. It is evident that his potential for dangerousness or irresponsibility within the institutional environment is below average compared to this inmate population.

*B.* If released to the community, his potential for violent behavior is also estimated to be no more than the average citizen in the community. Inmate Brodsky is by nature a very passive, rational, considerate individual. There is no evidence of any antisocial thinking in his behavior or values. He has maintained his marriage even while he is in prison. He has strong family support. He has received laudatory chronos for his work as a teaching assistant in education, as well as his program clerk assignment now. He has a strong work ethic, as evidenced by his strong employment history prior to the commitment offense, as well as his performance in the institutional environment. All of these factors indicate a positive adjustment on parole.

*C.* In considering significant risk factors in this case, there are no risk factors at this time. He does not have a drug or alcohol use problem.

## *XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:*

There are no psychological factors evident in this case that would interfere with routine parole planning. Being a college graduate, he has no academic deficits. He has participated extensively in self-help groups, including anger management and rational thinking. He does have strong family support in the community. He does not have any lofty goals, ambitions, or desires to make money at this point in his life that could cloud his judgment. His understanding of the dynamics associated with his actions in the commitment offense appear to be sound. No further psychological evaluations are necessary in this case. No further therapy or self-help participation is seen as necessary.

Melvin Macomber PhD

*Melvin Macomber, Ph.D.*
*Licensed Psychologist*
*Correctional Training Facility, Soledad*

*BRODSKY, CLIFFORD*
*CDC NUMBER: H-07665*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE FOUR*

, Ph.D.

*B. Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*MM/gmj*

*D: 04/16/05*
*T: 04/18/05*

*D:\Word Files\BPT - 2005\BRODSKY, C. H-07665 04-05 MACOMBER.doc*

*BRODSKY H-07665 CTF-CENTRAL 04/16/05 gmj*

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**DECEMBER 2002 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**JUNE 14, 2002**

Inmate Clifford Brodsky, CDC# H-07665, was seen for a psychological evaluation for the Board of Prison Terms by Steven J. Terrini, Ph.D., Staff Psychologist at the Correctional Training Facility (CTF), on 05/20/00 for the July 2000 Lifer Calendar.

According to the instructions given to Wardens and Health Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis Chartrand, Jr. (BPT) in September 1998, once a mental health evaluation is completed in the new format, revised in August 1998, a new evaluation is not necessary when an inmate appears before the Board of Prison Terms unless the BPT has filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health evaluation was not conducted at this time.

**BILL ZIKA, Ph.D.**
**Senior Supervising Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D: 06/14/02
T: 06/14/02

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JULY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 20, 2000

This is a psychological evaluation for the Board of Prison
Terms on inmate Brodsky, CDC# H-07665.  This report is the
product of a personal interview, conducted on 04/20/00, as
well as a review of his Central file and unit health record.
This interview was a single contact with this individual for
the sole purpose of preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Brodsky is a 56-year-old, married, Caucasian
      male.  His date of birth is 08/13/43.  He stated his
      religion is Jewish.  There were no unusual physical
      characteristics noted and he denied any history of
      nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      He denied any history of birth defects or abnormalities
      of developmental milestones, a history of cruelty to
      animals, a history of arson, or a childhood history of
      physical or sexual abuse as either a perpetrator or a
      victim.  He had a hernia operation during his
      childhood.

III.  EDUCATIONAL HISTORY:

      Inmate Brodsky has a BS degree in educational history.
      He also has a master's degree in administration.
      Vocationally, during his incarceration period, he has
      participated in textiles.  He has worked as a teacher's
      aid and is about to complete mechanical drafting.

IV.   FAMILY HISTORY:

      Both of his parents are still alive at approximately
      age 80.  He has weekly contact with them through the
      telephone and letters.  He has one sister whom he has
      minimal contact with.  He stated that he has had good

relationships with all of his family members. He denied that any of his family members have ever had any significant criminal or substance abuse problem. In the past, both of his parents have had problems with depression.

V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Brodsky stated that he is a heterosexual male. He denied any history of sexual aggression.

VI. MARITAL HISTORY:

Inmate Brodsky is currently legally married and this is his second marriage. He has a daughter from his first marriage, as well as a son and a stepchild from his current marriage. He maintains contact with his children and has some contact with his wife.

VII. MILITARY HISTORY:

Inmate Brodsky was in the navy for approximately four years. He did two terms in Vietnam and was involved in search and rescue. He received an honorable discharge.

VIII. EMPLOYMENT AND INCOME HISTORY:

Inmate Brodsky was the executive officer for a company that made ladies' undergarments and apparel. Prior to that, he had worked in the information systems field. When he paroles, he hopes to again find employment in the retail business with family members who own retail outlets.

IX. SUBSTANCE ABUSE HISTORY:

Inmate Brodsky denied that he ever used illegal drugs. He acknowledged drinking wine and beer, but stated that he never had a significant alcohol problem. He attended Alcoholics Anonymous briefly, and has also attended Millati Islami, which is the Muslim substance abuse program. In the past, while at other institutions, he also attended Addiction Recovery class and a class on Codependency and Addiction.

X. PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Brodsky's most significant medical problem has been removal of a cyst on his leg and a history of colitis. He currently does not have any significant medical problems and does not take any current medication. He denies a history of serious accidents or head injuries, a history of suicidal behavior, or a history of seizures or other neurological conditions.

XI. PLANS IF GRANTED RELEASE:

When he paroles, he plans to live with his daughter. Given the information he provided to me (especially his significant work history and good family support), his prognosis for community living is very positive.

CLINICAL ASSESSMENT

XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Brodsky appeared his stated age. He was appropriately dressed and groomed. He was coherent, cooperative, calm and alert. His speech, flow of thought and affect were all within the normal range. His intellectual functioning was estimated to be above normal. He showed no evidence of a mood or thought disorder. His judgment appeared to be sound. He showed very good insight into his commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I: Adult Antisocial Behavior.
AXIS II: No Contributory Personality Disorder.
AXIS V: GAF = 90.

His prognosis is extremely positive for being able to maintain his current mental state in the community upon parole.

XIII. REVIEW OF LIFE CRIME:

Inmate Brodsky essentially agreed with the account of his crime found in his Central file. He stated that he takes responsibility for his involvement in this crime, stating, "I blame myself. I should have walked away

from this, but I didn't. I am responsible. I believed I should be punished for this." He acknowledges the harm that he has caused the victim's family, as well as his own family, due to his actions. He displayed appropriate and genuine remorse for this crime.

XIV. ASSESSMENT OF DANGEROUSNESS:

A. In consideration of several factors, including his lack of any criminal history (either as a juvenile or as an adult), his lack of any violent criminal history, his lack of any CDC-115 violations or CDC-128 violations, and his lack of any violent CDC-115 violations, his violence potential within a controlled setting is estimated to be very significantly below average relative to this Level II inmate population.

B. If released to the community, his violence potential is estimated to be no more than the average citizen in the community.

C. There are no significant risk factors which would be considered precursors to violence for this inmate.

XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A. This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has done so during his incarceration period.

B. This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

C. It does not appear this man ever had a significant drug or alcohol problem, so there are no recommendations in this area.

D. This man should be commended for remaining violation-free during his entire incarceration period.

BRODSKY, C.
CDC NUMBER: H-07665
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

E. I believe this man is an excellent candidate for parole consideration.

STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

SJT/gmj

d: 04/20/00
t: 04/21/00

BRODSKY H-07665 CTF-CENTRAL 04/21/00 gmj

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
DOCUMENTATION HEARING/SEPTEMBER 1994

IDENTIFICATION:

Mr. Brodsky is a 51-year-old, first-term Inmate, who is serving 15 years to life for conspiracy to commit murder. This is his first documentation hearing before the Board of Prison Terms. A clinical interview of 45 minutes duration and review of the central and medical files provided the basis for this report. The total time to prepare and complete this report was three hours.

PROGRESS TO DATE:

Mr. Brodsky's classification score is 28. It is expected to be lower this term. Mr. Brodsky's description of his cellies has been that he has been fortunate to have cellies close to his own age. At present, his cellie has been physically sick though it is not contageous. The Inmate has earned a Master of Arts degree outside the prison system. Therefore, it has not been necessary for him to engage in additional educational pursuits. Mr. Brodsky has been a Laubach tutor and an instructor for life skills while at another CDC institution. He would like to continue to improve himself. Mr. Brodsky has worked as a clerk; other duties have been on the yard crew. Overwhelmingly, he has received above average and exceptional work chronos. Mr. Brodsky has not participated in AA or NA as he is close custody and has other activities during the evenings. Alcohol or substances have not been deemed to be factors related to the instant offense or to pose problems in his interpersonal functioning. He makes and receives telephone calls from his family and therefore, they don't write to each other. Generally he has visits from family members. It is difficult to accommodate them with scheduling so that it has been five to six months since the last visit.

Mr. Brodsky has not had any individual psychotherapy experiences while incarcerated. However, he has engaged in an ethics workshop, receiving excellent participation (2/13/93). Additionally, he had volunteered in the College for Convicts program (2/16/93). Other workshops that Mr. Brodsky has completed are Addiction Recovery workshop (4/7/93); Anger Control workshop which included coping strategies (6/29/93); and a Codependency and Addictions workshop (9/13/92).

INMATE'S VERSION OF INSTANT OFFENSE:

Mr. Brodsky admits to the instant offense. He states that it was like playing a ball game in that he wanted to win. He attributes that he lost sight of what was reality and that he was too wrapped up in the game. Winning was more important. Thus, he was unaware that he had a considerable amount to lose. Mr. Brodsky reflects that he had nothing as a kid and he had grown up poor. He described this as a simple life. But today a simple life looks very attractive to him. Mr. Brodsky believes he should have stopped and made a self-assessment earlier in life. He and his wife consulted about the businesses; both agreed they were living well enough to stop growing. Mr. Brodsky attributes that he has always been competitive and would compete for advantage, yet recognizes that you don't destroy in the process.

According to the inmate, the instant offense began as Black Humor. Mr. Brodsky deliberately contacted two previous employees, both of whom had had a criminal history. He then admits that he lost the nerve to back out because money had been paid to others to complete this crime. Mr. Brodsky in turn, was threatened by these crime partners and he feared for his life and his family's life. Mr. Brodsky regrets that he did not go to the police at the time. His values include a drive to succeed. He admits that he does become annoyed by people who fail. This is perhaps one of the pieces which explain his psychological functioning throughout life and prior to the instant offense. Mr. Brodsky turns this value on himself also where there is a continued drive for success and might be annoyed with himself for failure. There is considerable remorsefulness in that Mr. Brodsky is pained by the effect that this has had on his wife and children.

PAST PSYCHIATRIC HISTORY:

Mr. Brodsky denies any drug history but admits to occasional alcohol usage. Reflecting today, he recognizes that his father was perhaps in a state of depression later in his life (during the mid 1980's). During the 1960's his mother had made past attempts to commit suicide.

Historically, Mr. Brodsky has displayed rigid thinking. According to a psychological report (8/9/91) Mr. Brodsky was also depicted with rigid thinking. Often his themes were of success and failure, loyalty and betrayal. Mr. Brodsky is still relatively fixed on a success and failure theme. He claims to be self-critical, analytical and extreme in his expectations. Though the psychological report (8/9/91) carried a diagnosis of Post Traumatic Stress Disorder-delayed. It is not believed that Mr. Brodsky is experiencing current symptoms of P.T.S.D. However, given the intensity of his emotional expression related to the war and the instant offense, it is believed that Mr. Brodsky still has some psychological processing to complete. Those being rigidity in thinking and little if any, integration of emotional experience. Mr. Brodsky repeats themes of success and failure, loyalty and betrayal. Mr. Brodsky would benefit by understanding how and why he maintains those themes so fixedly.

Today his family relationships with mother and father are estranged. Though his parents continue to correspond and communicate with his daughter, there has been no communication with them.

PRESENT MENTAL STATUS EXAMINATION:

Mr. Brodsky was dressed casual with attention to grooming and hygiene. He articulated himself well. There was no evidence of thought disorder nor major mood disturbance. Mr. Brodsky showed little range of emotion with blunted affect. He does admit to mild feelings of depression which don't last too long. He is able to problem solve on a daily basis. He reports that he can sleep anytime, anywhere; and that he has a good appetite. His short-term and long-term memory were good. His intellect range is above average. Insight is considered to be good and judgment, at present, is also good.

His goals are to do his time and to go back into society. While here, he would "try to contribute what I can with these guys that leave." Mr. Brodsky would like to continue to study the Hebrew language and Jewish faith, as well as to read and keep in shape.

DSM IV IMPRESSION:

| | | | |
|---|---|---|---|
| AXIS | I | V71.01 | Adult antisocial behavior. |
| AXIS | II | V71.09 | None. |
| AXIS | V | | GAF; 80 (If symptoms present they are transient and expected reactions to psychosocial stresses; no more than slight impairment in social, occupational or school functioning). |

CONCLUSIONS/RECOMMENDATIONS:

1. Mr. Brodsky is competent and responsible for his behavior. He has the capacity to abide by institutional standards. He has remained incident free while incarcerated.

2. There is no evidence of major mental illness on AXIS I in that there is no major thought disorder nor mood disturbance. He has carried an AXIS I diagnosis of Post Traumatic Stress Disorder, by history. At present he exhibits no signs nor symptoms of this. It is believed that he could benefit from processing some of the psychological trauma that he has experienced. AXIS I diagnosis does carry adult anti-social behavior related to the instant offense. This would appear to be an isolated incident. There is no AXIS II personality disorder. Mr. Brodsky is believed to be functioning at a high level with minimum impairment or only expected reactions to stresses.

3. Violence potential is below average for this level of incarcerated inmate.

4. Mr. Brodsky seems to have explored the committed offense and has come to terms in part with its underlying causes. He would benefit by integrating his emotional experiences. It is recommended that he engage in any self-help reading related to this, and if possible engage in individual psychotherapy.

5. Mr. Brodsky has generally displayed good judgment, but again underlying personality traits have interfered with his continued success when his judgment became severely impaired related to the instant offense.

Reviewed by:

Elizabeth R. Gates, Ph.D.
Staff Psychologist

William O. Evans, Ph.D.
Senior Psychologist, Supervisor

ERG:ks

cc: C-File
Unit Health Record

Date Interviewed: 8/2/94

JEFFREY W. WHITING, PH.D.
CLINICAL PSYCHOLOGIST

2116 WILSHIRE BOULEVARD, SUITE 208
SANTA MONICA CALIFORNIA 90403
TELEPHONE (213) 828-2550
FACSIMILE (213) 829-7932

PSYCHOLOGICAL ASSESSMENT

August 9, 1991

| Identification | Name: | Clifford Brodsky |
|---|---|---|
| | Address: | 625 Esplanade #30<br>Redondo Beach, California 90277 |
| | Birthdate: | August 13, 1943 |
| | Age: | 47 |
| | Education: | B.S. Education (Penn State) |
| | Occupation: | Clothing Manufacturing, Owner |
| | Marital Status: | Divorced for 8 Years after 14 Year Marriage; Engaged |
| | Children: | Stacy, 19; Nicholas, 2 |

Referral

Mr. Brodsky was referred for psychological evaluation by his attorney, Richard Chier. An elaboration of Mr. Brodsky's personality characteristics and a description of his current level of emotional functioning were requested. Mr. Brodsky is to be sentenced on August 15, 1991, for conspiracy to commit second degree murder.

Assessment Methods

Minnesota Multiphasic Personality Inventory - 2
Forer Structured Sentence Completion Test
Thematic Apperception Test
Clinical Interview

Observations

Mr. Brodsky appeared on time for all of his meetings with me. He cooperated fully with all procedures and there was evidence of above average effort devoted to the tasks that I asked him to complete. He was groomed and did not show any gross motor deficits. It was easy for him to establish eye contact and a working rapport rapidly developed. His mood was moderately anxious and his affect was sometimes blunted, although always appropriate to the content of the discussion. His memory was intact for immediate, recent and past events. There were no deficits noted in a screening of cognitive functioning. His judgment and insight were noted as being from average to above average depending on the subject. There were no symptoms of disorder in either thought content or thought processes.

Results

Mr. Brodsky was administered three personality tests. The first was a large

Results (Continued)

objective, criterion-validated instrument that is the most widely used personality test in the world. Mr. Brodsky produced a valid profile in that the markers for defensiveness or manipulation were not present in his results. His clinical profile suggests a lifestyle of pressured overactivity. He could be seen as euphoric, expansive, and optimistic when things were going well in his life, but he would become intensely emotional when under pressure. Some would describe him as being stubborn about "doing things my way because it is the right way". His ego strength, however, is above average, and this would predict effective functioning and practical self-sufficiency in many areas. He could be seen by friends and associates as being extremely competitive with himself and others. He would be an extremely loyal cohort and a formidable foe. His emotional pattern would be one of holding his feelings in until a threshold is surpassed and then verbally expressing himself in an offensive manner. He does not possess a pattern that would suggest that he would resort to physical violence. What this means is that he would be prone to stew and brood and be quiet, and then explode in a verbal tantrum. It is unlikely that he adequately connects the fact that storing, instead of immediately expressing feelings results in explosions. It is important to note that under peaceful conditions, he would appear quite calm and controlled.

Mr. Brodsky was given two projective tests that allow the individual to "project" their personality features onto ambiguous stimuli. This allows not only for the revelation of information that could be directly expressed by the testee, but also issues that might be normally denied or defended against. On the more structured of the two instruments several themes emerged. He has a good and straight-forward problem solving approach that probably has assisted him in becoming successful. He reveals a very strong drive for success and overcoming obstacles. His greatest fear is to become a failure. He evidences grave concerns about being involved with people who may betray him. On the other hand he feels great affinity toward people who "play on his team". It was striking how most of his issues seemed to be tied to success and failure, loyalty and betrayal. Most other people would have an array of feeling states suggested on this test, but Mr. Brodsky stays within a narrow range of experience. It is as if he would be overwhelmed with feelings if he were to venture beyond this restrictive calibration of his affective states. Trauma victims frequently have fashioned this adaptive pattern to life stressors. Every response to stress is processed in a rigid, unchangeable manner in the hope that feelings that are analogous to the ones he felt about the trauma are never directly experienced for fear of being overwhelmed.

On the second projective instrument Mr. Brodsky once again revealed this narrow range of processing emotional material. Many themes tended to be around success and failure, i.e., "if you try you will succeed, if you don't, you will fail". Emotional upsets are to be fixed; there are

Results (Continued)

rational solutions to all problems. He was able to assign feelings to subjects in his stories that he told. What was remarkable was that there were no interpersonal results or solutions. Someone was hurt, they might tell someone else, then they would go away and the other person cries. There were no stories about one person actively comforting or consoling another. It appears that Mr. Brodsky does not expect that others will be able to understand his emotional pain and so he either does not express it or he denies that he is in distress. There was one point during this test when I saw Mr. Brodsky directly express a feeling. He was presented a blank card and asked to compose a story. His creation described his fiancee and his children being happy with each other and enjoying a pleasant place. When he was asked about the future of this story, he teared up and said "they'll be a lot older when we are able to do it again".

During the Clinical Interview I learned about Mr. Brodsky's tough childhood on the streets of South Philadelphia. His father was a career Navy man and was only occasionally home. In his absence, Mr. Brodsky's mother "ruled with a strap". He recounts that as a boy he learned to stay in his neighborhood with his crowd of friends less he stray into another group's territory and receive a severe beating. He recounted several times when he was involved in such fights, sometimes as the victim, other times as one of the victimizers. He reported that this was the "law of growing up in a bad neighborhood". He does not believe that this background affected him during adult life because "all of us in South Philly went through the same thing". He reports that his father was stern, prone to temper outbursts, and was physically intimidating. Evidently Mr. Brodsky's father was a boxer while in the Navy and on a couple of occasions took a swing at his adolescent son in order to emphasize a point. Mr. Brodsky's mother was described as being capable and successful in setting limits with Mr. Brodsky and his sister. However, she remained emotionally dependent on his father and was quite upset most of the time because of his father's absence.

Mr. Brodsky successfully pursued his degree in education at Penn State. He reports being relieved to leave the "mean streets" behind forever. While in college he joined the Naval Reserves because he wanted to travel. When the Vietnam War was in its early stages he completed Officer's Candidate School and received his commission. He was greatly disappointed to learn that his vision was to keep him out of Aviation School. He then got involved in a conflict with the Navy because they had assured him of a place in air intelligence and then did not send him for that training. He ended up having to tell them that he would quit any other training they would send him to, but then the War heated up and he was sent to the Fleet. He reports that this struggle over his specialized training was aggravating but "then events of the war solved all of this. There was no time for any more training. I was needed."

Results(Continued)

There were two times in my interview when I saw a tremendous amount of emotion registered in Mr. Brodsky. The first was when he described his war experiences. He became rageful in his mannerisms and his language. This display was not inconsistent with the events that he was describing. What was surprising was how powerful the response has remained to events of 23 to 25 years ago. It was as if he was responding to something that was currently happening. He described the horror of listening on the radio to men being killed and not rescued because of red tape and political harnessing of the military action. He felt responsible for participating in the saving of men and instead he was forced to sit idly by and listen to their screams of anguish. Sometimes he would listen helplessly when a rescue operation was failing and the rescuers would be killed. He blamed the deaths of his fellow soldiers on the corrupt bargain that the politicians had made with the fighting men and women. He had joined the service in order to serve his country and he thought that his country would then not prohibit him from doing his job. He was mortified to experience his country betraying him and his fellow soldiers, many who he heard die because of this betrayal.

The other time I saw him express strong emotion in our meetings was when he discussed the partner who betrayed him and ignored a commitment that he had made to Mr. Brodsky. He described how important it was in business to follow through with plans that were contractually agreed to and how financial success would never be attained if partners did not remain loyal to each other. He was visibly angry while he told me the story of how this man blatantly rejected Mr. Brodsky's good faith efforts and openly flaunted his contempt for the agreement with Mr. Brodsky that he was ignoring. Of all the subjects we covered in a lengthy interview, the war and this dishonest business partner were the only subjects that elicited a strong show of emotion. The displays of pronounced emotion were striking in their similarity.

Summary

Mr. Brodsky is a 47 year old clothing manufacturer who is currently experiencing acute symptoms of anxiety and anticipatory loss. The results of his personality evaluation reveal a man who does not express his emotional distress in a manner that is adaptive but rather in one that insures that he will have temper outbursts that will intimidate others. This style guarantees that emotional material is never adequately addressed and he rarely feels understood. His developmental history suggests that he did not grow up in a home where talking about one's feelings was the thing to do. On the streets he learned that one just accepts that certain threats, pains and injuries come with the territory and one absolutely did not complain about anything. Everyone was in the same boat; anyone who resorted to telling an adult so the fighting would stop was summarily

Summary(Continued)

beaten. Mr. Brodsky brought his coping strategies with him when he went to Vietnam and there he experienced horrors that he had no means to cope with. He felt horribly betrayed and there was no adequate means to express the huge reservoir of feeling that filled to its brink as he suffered through his war nightmare. He felt contempt toward the "politicians who had allowed so many good trustworthy, committed soldiers die for no good reason". Mr. Brodsky had listened to them die and he has not been able to remove their screams for help from his mind.

My view is that since 1968 Mr. Brodsky has been a timebomb waiting to go off. All that was necessary for him to reexperience some of those rageful feelings that he had buried in the late 1960's was an analogous experience. This is indeed what happened. Mr. Brodsky and a partner had made commitments to each other. Mr. Brodsky believed that he had been faithful but that this man had not only betrayed Mr. Brodsky's trust but that he also had "rubbed my face in it". The anger that had been buried for 20 years came to be focused on this traitorous partner. Not unlike the feelings he had directed toward LBJ, Mr. Brodsky felt that this partner had taken his good intention, trust and faith, that Mr. Brodsky had been willing to risk, and had abandoned him.

Diagnosis

DSM III Axis 1 309.81 Post-traumatic Stress Disorder(PTSD), Delayed

Recommendation

Like so many other Vietnam Veterans, Mr. Brodsky is a man who we did not know was in terrible need of psychiatric intervention until he comes to our attention in an unfortunate manner. That is, after his internalization of his suffering and his adaptive style for his war experiences are blatantly shown to be maladaptive, then we make the diagnosis that he needs help. I recommend that he receive psychotherapy for this stress disorder. I believe that Mr. Brodsky's experience of trauma, his inability to work through his reaction to that trauma, and our society's delayed appreciation for and awareness of the nature of that trauma, have resulted in his behavior for which he is going to be punished. Full recovery from PTSD is possible but only when the patient receives intensive treatment.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Jeffrey W. Whiting, Ph.D.

Exhibit "F"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| | | | | |
|---|---|---|---|---|
| Date: | SEPTEMBER 13, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004628

In re,
CLIFFORD BRODSKY,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed by Petitioner on April 25, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. See Cal. Code Regs., tit. 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

Petitioner was received in the Department of Corrections on August 30, 1991 after a conviction for conspiracy to commit murder in the second degree. He was sentenced to a prison term of fifteen years to life. His minimum parole eligibility date is August 15, 2001.

The record reflects that in March of 1989, Petitioner hired two men to kill his business associate, Robert Krugman. At the time, Petitioner was the chief executive of a clothing manufacturer, the Mary Jane Company. A business dispute arose between Petitioner and Krugman, the head of a women's sportswear company in which Mary Jane had invested, and Krugman stopped making payments on the $1.1 million his company owed to Petitioner's firm. Petitioner hired two men to kill Krugman so that Mary Jane could collect on the proceeds of a $1.25 million "key man" life insurance policy on Krugman. In furtherance of the conspiracy, Petitioner assisted in obtaining a car for the use of the prospective killers, provided Krugman's location to the prospective killers, and asked the prospective killers if the payment arrangements were satisfactory. The plot was reported to the police before it could be carried out.

The Board found Petitioner unsuitable for parole after a subsequent parole consideration hearing held on November 6, 2006. Petitioner was denied parole for one year. The Board concluded that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The Board based its decision primarily on Petitioner's commitment offense.

The Court finds that the record shows "some evidence," based upon the circumstances of the commitment offense, to support the determination that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. The offense was carried out in a manner that shows an exceptionally callous disregard for human suffering. Petitioner hired two men to kill a business associate over a financial dispute. The murder was averted only because the plot was reported to the police before it could be carried out. Petitioner participated in the planning of the crime over a period of months. Although he

Minutes Entered
09-13-07
County Clerk

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | SEPTEMBER 13, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004628

In re,
CLIFFORD BRODSKY,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

had ample time and opportunity to try to stop the murder-for-hire plot, he did not do so. He continued with his plans to have Robert Krugman murdered without consideration of the impact or consequences to Krugman's wife and children. The Court therefore finds there is some evidence that supports the determination that the commitment offense showed an exceptionally callous disregard for human suffering, a ground for finding petitioner unsuitable for parole under Cal. Code Regs., tit. 15, § 2402(c)(1)(D).

In supporting its finding of unsuitability, the Board also stated that the motive for the crime was "inexplicable and very trivial in relation to the offense." The motive cannot be both inexplicable and very trivial. However, based on its review of the record, the Court finds that the motive for the crime was very trivial in relation to the offense. Petitioner set into motion a scheme to kill a business associate so his company could collect on the $1.25 million life insurance policy on the victim. Greed or financial gain is a very trivial motive for deciding to take a human life. It is not reasonable to conclude that assassinating someone is the only way of resolving a business dispute. The record also indicates that Petitioner may have been motivated by a fear of failure or looking incompetent, again a very trivial reason for planning to take someone's life. The very trivial motive is a ground for finding that the offense was especially heinous, atrocious, or cruel, and supports the Board's determination that Petitioner is unsuitable for parole based on the circumstances of the commitment offense. Cal. Code Regs., tit. 15, § 2402(c)(1)(E).

The Court commends Petitioner's participation in vocational and self-help programming in prison. The fact that he has not incurred any disciplinary violations or warnings during the entire period of his incarceration is particularly noteworthy. The Board likewise credited his positive behavior and programming in prison. However, it found that Petitioner would benefit from additional self-help programming, particularly self-study and the preparation of book reports, and also needed to earn more laudatory chronos. The Board's decision is entitled to great deference. Accordingly, there is some evidence to support the Board's finding that Petitioner would benefit from additional self-help programming and further efforts to enhance his suitability for release on parole.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

Minutes Entered
09-13-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| | | | | |
|---|---|---|---|---|
| Date: | SEPTEMBER 13, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004628

In re,
CLIFFORD BRODSKY,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Clifford Brodsky
H-07665
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

State of California- Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, California 92186-5266
Attn: Ms. Cynthia Lumely

Minutes Entered
09-13-07
County Clerk

Exhibit "G"

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**DEPUTY COMMISSIONER YACONO:** We're back on, Sir.

**PRESIDING COMMISSIONER GARNER:** Okay, very good. Thank you. All Parties previously in the room have returned in the matter of Clifford Brodsky, CDC H, Henry, 07665.

Mr. Brodsky, the Panel has reviewed all the information received from the public and relied on the following circumstances in concluding that you're not yet suitable for parole, and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

It's going to be a one-year denial. Certainly, the denial is based on the commitment offense, but the Panel also is not comfortable with the psychological exams, and we'll get into that a little further when we get to that section.

With respect to the commitment offense, the Panel noted that it was carried out in an especially cruel and callous manner in that between the period of March 1st, 1989 and July 11, 1989, you conspired to kill a Mr. Robert Krugman.

The Panel noted that the offense was carried out

in a very dispassionate and calculated manner in that this was planned, to the extent that you sought out an individual that had the character that would allow him to know and find an individual that would carry out this dastardly deed.

Also noted that at the time of this offense, oftentimes we're told, and I did it because I was young and stupid, and this certainly isn't a category in either place that you would fall into. We took into consideration your age, your prior military service, the background and training you received while in the military, your academic background, and the position of trust that you entertained with Mr. Krugman. And essentially, the age and wisdom that you had certainly would have afforded you the opportunity to seek a less violent outcome.

The Panel noted that the motive for this crime, it certainly involved anger, and this was anger over a business dispute. The conclusions were drawn from the Statement of Facts that were contained in the probation officer's report, which was completed on August of 1991. It's been previously read into the record in detail and at this point, will be adopted by reference.

The Panel did note and consider that you had no

record as a juvenile or as an adult up to the commitment offense. And so far as your institutional behavior, the Panel noted the complete lack of any discipline reports, and that your programming has been exemplary.

The psychological report, the one that we focused on, was by Dr. Marek from August of 2006. And the Panel wasn't satisfied completely with the doctor's responses to the specific information requested.

The Panel is also concerned that it didn't utilize the current documents that are being used by the Board now, that we're doing our own psychs. And it's this opinion, this Panel's opinion that we need to have resolution on that issue. That being said, we've asked that a complete new exam be completed utilizing the new format before your next hearing.

Parole plans, your parole plans are fine. It's obvious that you've got a very good support system waiting for you on the outside.

So far as the 3042 notices, we noted the position of the District Attorney's Office and we also did review the Court sentencing proceedings. We also took into consideration a comment from the victim in this case. And we also reviewed the transcripts from previous hearings, particularly the last hearing, and noted and

considered the comments that were included in that particular transcript.

Certainly, I want to commend you for not having any disciplines. That is something, as Ms. Hurst indicates, that we find that it's a rarity, and that's to your credit.

As indicated, we're going to deny you for the year, and the request that we will make of you, and recommendation, I should say, is that certainly that you continue to remain disciplinary-free. To the extent the programs are available, that you continue to participate in your self-help, in any means by which you can achieve more chronos, it certainly would be helpful. And of importance, certainly get your letters updated from the people.

I also did note and considered the document Ms. Hurst provided to me, that upon the age of 62 and also at the age of 65, the supplemental income that you will have from the Social Security Administration. Commissioner, any additional comments?

**DEPUTY COMMISSIONER YACONO:** No, I don't think so, Sir. Thank you.

**PRESIDING COMMISSIONER GARNER:** All right. It is now approximately 5:08 p.m., and that will conclude this

hearing. Thank you, sir. We'll see you next time.

--oOo--

PAROLE DENIED ONE YEAR

THIS DECISION WILL BE FINAL ON: MAR 04 2008

YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.

CLIFFORD BRODSKY H-07665 DECISION PAGE 5 11/5/07

# Exhibit "H"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

COURT OF APPEAL - SECOND DIST.
FILED
DEC 7 2007
JOSEPH A. LANE Clerk
Deputy Clerk

In re ) B 202907

CLIFFORD BRODSKY, ) (Sup. Ct. No. BA000576, BH004628)
) (Peter Espinoza, Judge)

on Habeas Corpus. )

ORDER

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied for failure to state sufficient facts or to provide an adequate record or legal authority demonstrating entitlement to the relief requested. There is "some evidence" to support the findings of the Board of Parole Hearings. (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.) In addition, Petitioner raises arguments that have been rejected in a previous petition for writ of habeas corpus (B193409). (See *In re Clark* (1993) 5 Cal.4th 750, 769 [court will deny an application for habeas corpus which is based upon ground urged in a prior petition which has been denied, where petitioner has shown no change in the facts or the law substantially affecting his rights.].)

* WILLHITE, Acting P.J., MANELLA, J., SUZUKAWA, J.

Exhibit “I”

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

COURT OF APPEAL - SECOND DIST.
FILED
JUL 28 2005
JOSEPH A. LANE Clerk
S. VEVERKA Deputy Clerk

| | |
|---|---|
| In re | B183409 |
| CLIFFORD BRODSKY, | (Super.Ct.No. BA000576; BH 002691) |
| on Habeas Corpus. | (David S. Wesley, Judge) |
| | ORDER |

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied.

Petitioner's allegation that his plea agreement contemplated he would be paroled at the expiration of the minimum term (10 years) is contrary to the record of the trial court proceedings. (Exh. "F, pp. 94-95; Exh. "G," pp. 119-120.) His allegation that the People breached the plea agreement by implicitly objecting to parole at the parole hearing of November 19, 2003, is contrary to the record of the parole hearing. (Exh. "G," pp. 76-77.) Further, under *In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071, 1077-1099, there is no merit to petitioner's contentions that the Board of Prison Terms' authority was constrained by the plea agreement, or that the Board abused its discretion in determining petitioner is unsuitable for parole.

* EPSTEIN, P.J., HASTINGS, J., WILLHITE, J.

Exhibit "J"

Exhibit "K"



**LIFE PRISONER EVALUATION REPORT**
**PAROLE CONSIDERATION HEARING**
**AUGUST, 2006 CALENDAR**

**BRODSKY, CLIFFORD** **#-H-07665**

## I. COMMITMENT FACTORS:

A. **Life Crime**: PC187 (A) Conspiracy to Commit murder, Los Angeles County case #BA000576. Victim: Robert Krugman, age: unknown. Received by CDC on 8-30-91. Sentence: 15 years to Life. Life term started 8-30-91. MEPD: 8-5-01.

1. **Summary of Crime**: All relevant documents from the previous hearing(s) have been considered, and that information appears valid. The writer has no further information to add.

2. **Prisoner's Version**: In an interview for this report, Inmate BRODSKY indicated that his version remains the same as stated in the previous hearing.

3. **Aggravating/Mitigating Circumstances**: Remain the same as stated in the previous hearing.

II. **PRECONVICTION FACTORS**: Documents from the previous hearing have been considered, and that information appears valid. The writer has no further information to add.

III. **POSTCONVICTION FACTORS**: Documents from the previous hearing have been considered, and the information remains valid. During the period of time since the last hearing, the prisoner's behavior has improved, in that he has obtained self help in the area of Anger management Courses and continued to remain disciplinary free. He attended a Subsequent #2 BPH hearing on 8-23-05, wherein the panel recommended that he Get self help, remain disciplinary free and earn positive chronos. He has complied with all recommendations. See Postconviction Progress Report for details.

IV. **FUTURE PLANS**: Remain the same as indicated in the previous Board Report except that the address of his parole address has been changed. He will still parole to his daughter's residence and the address is 22703 Gaycrest Avenue, Torrance, CA. 90505, with telephone #(310) 540-2226. Updated letters will be sent.

**A. Assessment:** Brodsky continues to have solid residential and employment plans available. He has requested that two court documents be submitted with this report. They reflect that he had been released on bail after he was given his life sentence. Approximately two months later, BRODSKY reported for commitment as instructed. It is interesting to note that post sentence bail on a life term assessment is very unusual and would seem to lend itself towards his level of responsibility in this matter. With his

is interesting to note that post sentence bail on a life term assessment is very unusual and would seem to lend itself towards his level of responsibility in this matter. With his Parole plans, no prior criminal record and his accomplishments in education, military and business, it appears he would be able to succeed upon release to mainstream society. He has taken responsibility for his actions from the beginning.

**V. USINS Status:** N/A

**VI. SUMMARY:**

**A.** Prior to release, the prisoner could benefit from: Continuing to remain disciplinary free and attending self help groups.

**B.** This report is based upon an interview with the prisoner on 6-12-06 and a Two hour review of the Central File

**C.** BRODSKY was afforded an opportunity to review his Central File on 6-12-06, wherein he declined the review per CDC 128b dated 6-12-06.

**D.** No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING **(Life term started 8-30-91)**

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8-16-05 To 6-12-06 | | | **PLACEMENT:** Remained at CTF.<br>**CUSTODY:** MED A.<br>**VOCATION:** None this period.<br>**ACADEMIC:** None this period.<br>**WORK:** Assigned as a Unit Office clerk this period.<br>**GROUP ACTIVITIES:** Completed a 12 week Anger Management course per certificate and CDC 128b dated 11-19-95. Also completed a self help video series called "Healing for the Angry Heart" per laudatory chrono dated 2-23-06. He is currently attending a 16 week Cage Your rage course which just recently started at CTF.<br>**PSYCH TREATMENT:** None noted.<br>**PRISON BEHAVIOR:** BRODSKY has continued to remain on a positive path towards parole suitability in adhering to all institutiinal guidelines and departmental expectations.<br>**OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE: S. Martinez CCI DATE: 6-12-06

BRODSKY, C. CDC# H-07665 CTF-SOLEDAD AUG/2006

BPT 1004 (REV 7/86)

S. Martinez CCI 6.12.06

S. Martinez Date
Correctional Counselor I

M. Arfa 6-15-06

M. Arfa Date
Correctional Counselor II

6/21/06

E. A. Da Rosa Date
Facility Captain (A)

D. S. Levorse C&PR 6/26/06

D. S. Levorse Date
Classification and Parole Representative

Exhibit "L"

July 1, 2006

Board of Prison Terms
Sacramento, CA 95814

Dear Board Member:

I am Anastasia D. Hasara, the 34 year old daughter of Clifford Brodsky (Inmate H07665). I have known and been extremely close to my Father all my life.

I want to take this opportunity to offer my Father any support that is required when he is released from prison. I am a stay-at-home Mother of a 2 year old , and I live in the Los Angeles area, we live in a two bedroom home. I want my Father to come live with me in the Torrance area after his release.

He will have a stable home to live in, and in the general Los Angeles area there are many members of his family and friends to assist in his acclimatizing himself back into society.

My Father and I have always had a close personal relationship and I know him very well. Over the past fifteen years he has reflected deeply and with remorse on his offense; having acknowledge his guilt and personal responsibility prior to his being incarcerated. He realizes the wrongs of his actions and I know it was temporary out of character for him resulting from unusual stress and cannot happen again.

Thank you for reading and considering this letter.

Respectfully,

Anastasia D Hasara

Anastasia D. Hasara
22703 Gaycrest Ave.
Torrance, CA 90505

July 1, 2006

Board Of Prison Terms
Sacramento, CA 95814

Dear Board Members:

My name is Barbara Duffy. I am a Sister-in-Law of Clifford Brodsky (Inmate H07665) and have known him for over 30 years. I live in the Santa Monica area of Los Angeles County and am the owner of a retail apparel business.

Both myself and the rest of our family will provide Clifford with any necessary support to insure his smooth return and productive reentry into free society. I will provide him with employment helping to operate my retail business. One with which he is very familiar and that is in an industry that he has had considerable previous business experience. Clifford is very close to all members of his family and he has a warm relationship with all of our members. He has helped many of us in the past many times.

I know that Clifford committed an out of character offense, at an unusually and uniquely stressful time in his life. One that will not return again. He has repeatedly acknowledged and accepted his responsibility for his role mentioning it with great remorse and regret for the difficulties and pain that it has cause. I know that he will never repeat this or any other offense.

Sincerely,

Barbara Duffy
HOME:
1333 9th St.
Santa Monica, CA 90401
(310) 395-4238

BUSINESS:
Seahorse
801 Ocean Ave. # 13
Venice, CA 90401
(310) 392-6636

September 15, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

Dear Board Members:

I am the 17 year old son of Clifford Brodsky (Inmate H-07665), and a high school senior. I know that in 1989 my father committed an illegal act, and that when I was two years old he accepted responsibility for that act and pled guilty, and did so while he was at home, not in jail. My family (my mother, sister, and grandmother) explained to me what happened at that time and afterward. I know that my father regrets the mental suffering he has caused all concerned, and the suffering his absence has caused our family, including myself. Fortunately, no one was hurt during the commission of his offense. In recognition of that fact, my father's attitude toward accepting responsibility for what he did, and because of his background and family ties, the prosecutor and court allowed him to temporarily remain free after he was convicted and sentenced, and arranged for him to later surrender himself.

Nothing can change about what occurred years ago, except a person's attitude. My father has demonstrated his changed attitude, first by pleading guilty, and thereafter by what he has done while in prison. I know that given all these years, my father will never commit another crime. He has paid the required price in years for his crime and should be allowed to return home to his family.

Thank you for considering my letter.

Sincerely yours,

Nicholas A. Brodsky
28226 Bel Monte Court
Canyon Country, CA 91387

State of California

Department of Corrections

# Memorandum

Date : May 21, 2005

To : Parole Committee

Subject : C. Brodsky (H-07665)

Mr. Brodsky is one of those rare individuals in the correctional system who possesses genuine kindness, thoughtfulness, and personal growth, and I urge the Parole Board to discover these qualities in him for themselves. I have worked with thousands of inmates, but he is only one of two for whom I've felt compelled to write a recommendation for parole. Both in conversation and in action he demonstrates an unmistakably sincere sense of ethics and propriety that others look up to. As part of the correctional system, he is a model inmate with a perfect record who holds very responsible positions. Within the program I specifically coordinate, he has gone beyond the call of duty to help with challenging early-morning preparations for Chapel and Jewish events, and actively participates in the life of the congregation. Above all else, Mr. Brodsky has expressed great remorse for his past and has taken responsibility for his actions. There is little doubt that within the context of the CDCR, he is a model inmate who appears to be *de facto* rehabilitated, and who sustains an exemplary level of conduct. His parole, I believe, could demonstrate that our correctional and rehabilitative system is one of remarkable success and noteworthy justice.

Submitted by:

[signature]

Rabbi Jon Sommer
Jewish Chaplain
Salinas Valley State Prison/Correctional Training Facility

cc: Board Desk
C&PR
CC-1 Unit 2, S. Martinez
Inmate

September 15, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

To the Board Members:

My name is Andrew Hasara. I am married to Clifford Brodsky-s (Inmate H07665) daughter Anastasia and we have a 2 year old daughter. I have met Cliff and spoken to him many times over the past 11 years. I am 35 years old, and have lived in the Los Angeles area my entire life, and am employed as a Building Construction Inspector.

Having met all members of Cliff-s immediate family living the Los Angeles area, I know that he has a very close relationship with each of them. I know that he regrets deeply the offense he committed and the problems he caused all the affected parties and know that he will not repeat this or any other offense when he returns home.

Anastasia and I will actively assist his reintegration into free society by providing him with a place to live after his release for as long as necessary.

Thank you,

Andrew Hasara

Andrew Hasara
22703 Gaycrest Ave.
Torrance, CA 90505

September 20, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

Dear Board Member:

My name is Maureen McLaughlin and my relationship to Clifford Brodsky (Inmate H07665) is his former wife. Clifford and I were married for 12 years. I have known Clifford for 35 years. I currently reside in Torrance, CA, in the Los Angeles area. I am retired from Delta Air Lines after 18 years of service.

Clifford and I have been friends since 1968. He has been a wonderful father for our daughter Anastasia (age 34) giving her guidance and direction her entire life. He has been a good friend to me after our divorce assisting me with emotional and financial support.

Clifford has acknowledged and accepted his responsibility and guilt in this offense prior to going to prison. It occurred at a time of unusual stress in his life and was completely out of character for him, given the events and activities of his life prior to that time. He has continually reflected on its cause with deep remorse and I know that it will never occur again.

I and the rest of my family will provide him with any assistance and support necessary to insure his smooth return into society. He will live in an area wherein there are many members of his family and friends who can and will assist in his re-acclimatization.

Respectfully,

Maureen McLaughlin

Maureen McLaughlin
22703 Gaycrest Ave.
Torrance, CA 90505
(310) 540-2226

25 August 2006

Board of Prison Terms
Sacramento, CA 95814

Board Members:

My name is Francis D. Duffy. I am the brother-in-law of Clifford Brodsky (Inmate H07665) and have known him since June 1969, when I returned from Vietnam. I live in Washington, DC, and am a writer/editor employed by the U.S. Department of Defense.

I am a former marine (corporal; 1966-69; honorably discharged), and have always respected that Cliff is a former Naval officer who served with distinction during the Vietnam War. That and his years of college and graduate school, in addition to his considerable business experience, impress upon me the likelihood of his rapid integration into law-abiding society.

Cliff's behavior that lead to his conviction and incarceration seemed entirely out of character, perhaps owing to the considerable stress he was under at that time of his life. I gather from corresponding with Cliff that he has:

- accomplished significant rehabilitation;
- fully accepts the mistakes he made;
- has had sufficient years to reflect on his actions and their effects on others and society; and
- that he is rock-solid intent on becoming a law-abiding and productive member of society.

I stand ready to assist Clifford Brodsky in his positive goals.

Thank you for taking the time to read this testament.

Francis D. Duffy

Francis D. Duffy
11800 Old Georgetown Road
Windsor Villa #409
Bethesda, MD 20852

August 16, 2006

Board of Prison Terms
Sacramento, CA 95814

Board Members,

My name is Joan G. Roberts. I have known Clifford Brodsky (Inmate H07665) for over 30 years and am a close personal friend of he and his family. I currently live in the South Bay area of Los Angeles and have worked for Trans World Airlines for the last 30 years.

My relationship with Cliff and his family is very close and goes back many years. The offense that sent him to prison was completely out of character for him and occurred during a period of significant stress in his life. He has continually reflected remorsefully on it for many years, accepting responsibility for his actions. I know it will never re-occur.

I will offer Cliff any support that is necessary to help him readjust and re-acclimatize into society after his release from prison. I know with his educational, professional, and business background and family and friends he will be able to successfully return to society and be productive again.

Thank you for your time,

Joan Roberts

Joan G. Roberts
272 Via Linda Vista
Redondo Beach, CA 90277
(310) 373-1814

August 16, 2006

Board of Prison Terms
Sacramento, CA 95814

To whom it may concern:

My name is Richard Nutting. I have know Clifford Brodsky (Inmate H07665) for more than 30 years and am a close friend of his family. I live in Santa Monica, California and am presently retired from self-employment for many years in retail sales.

My relationship to Clifford and his family extends over a period of thirty years in which he always considered me a family member. I was shocked when I initially heard what he was involved in. Speaking with him in his years of confinement, I sense a feeling of regret and remorse on his part for the crime he committed. I feel that he would never go down that same path in the future.

I will support Clifford upon his release in any way that I can, knowing that he does have the capabilities of becoming a well-adjusted and successful person again.

With respect,

Richard A. Nutting

Richard A. Nutting
1333 9th St.
Santa Monica, CA 90401

(310) 434-9701

Board of Prisons
Sacramento, CA 95814

17 August, 2006

Dear Board Members,

My name is Paul Grinkevich. I have known Clifford Brodsky (Inmate H07665) for over ten years and am a close, personal friend of him and his family. I currently live in La Quinta, California. I am a tax accountant, having a private practice in the Los Angeles/Santa Monica area as well as being the officer manager and senior tax account at a local firm in Palm Desert.

My relationship with Cliff and his family has been close, going back many years. I should mention that he was a Naval Reserve officer for several years. I too was a Naval Officer, having retired after serving twenty years. The offense that sent him to prison was completely out of character for min, a man who had an exemplary career in both the Navy and the civilian world. It was because of tremendous stress in his life that derailed him from his moral and business way of life. He has reflected continually on his offense, and I know he is remorseful for his misstep. He accepts complete responsibility for his actions. I am sure it will never re-occur.

I will offer Cliff any support that is necessary to him him readjust and re-acclimatize nto society after his release. I know that with his educational, professional and military background and with the help of family and friends he will be able to return successfully to society to be productive once more.

Respectfully,

Paul Grinkevich
78-188 Calle Norte
La Quinta, CA 92253
760-771 1691

September 18, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

Board Commissioners:

RE: Clifford Brodsky (H07665)

My name is Mark McLaughlin and my relationship to Clifford Brodsky (Inmate H07665) is that I am married to his ex wife Maureen.

I am writing this letter in support of Cliff's timely release from prison. Clifford has a strong relationship with all his family members. I know that he regrets very deeply the offense he committed and the problems he caused all the affected family members, and I know he will not repeat this or any other offense when he returns home to his family.

Maureen and I will actively assist his reintegration into a free society by providing him with any assistance he may need.

Thank you for your time.

Mark McLaughlin
67673 N. Portales Dr.
Cathedral City, CA 92234

Exhibit "M"

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS
CDC-128B (8-87)

**Name BRODSKY, C. CDC # H07665 Housing YW-308L**

Inmate BRODSKY, C., H07665, has been actively participating in the Central Facility Veterans' Self Help Group (VGCTF), meetings during the quarter beginning , through , of . He has also been identified as a prior member of the United States Armed Forces verified by a copy of his DD-214 Report of Separation which is proof of his services.

Dr. J. Reed
Group Sponsor/Psychologist
Correctional Training Facility – Central

ORIG C-File
Cc Inmate

Date: 8/17/06 INFORMATINAL CHRONO CTF-C

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128 B (5-05)

NAME and NUMBER **BRODSKY, C. H07665 YW-308L**

Inmate BRODSKY, H07665, has actively participated in the "**Cage Your Rage**" Anger Management program. This twelve (12) session program addressed four (4) stages: "Anger, Past and Present", "Anger and Aggression", "What Causes Anger?", and "How to Mange Anger". This inmate has been equipped with the knowledge and tools to understand that, (a) Anger is an emotion, (b) Anger is controllable, and (c) to this powerful emotion, there is a choice whether or not to give in to it. Mr. BRODSKY should be commended for his participation in this program.

Reverend Judge C. Lindsay
Protestant Chaplain
CTF-Soledad

ORIG : CENTRAL FILE
cc : Protestant Chapel
: Inmate

DATE 10/5/2006 *LAUDATORY* GENERAL CHRONO

**Name and Number:** Brodsky, C H07665 YW-308L **CDC-128B** (Rev.4/74)

Inmate Brodsky has successfully participated in and completed the Muslim Development Center's (Twelve-week) Anger Management Course. The course is based on principles rooted in Interfaith Religious Scripture and spiritual models of exemplary social behavior. Inmate Brodsky is commended for his outstanding participation and completion of the Interfaith based Anger Management Course and was awarded a Certificate of Completion.

Original: C-File
cc: Chaplain File
Inmate

Antar N. Jannah

Imam Antar Jannah
Muslim Chaplain
Correctional Training Facility - Central

**Date:** 11/19/2005 **(Anger Management Course Completion)** **GENERAL CHRONO**



# Cage Your Rage Program

This is to certify that

**BRODSKY, CLIFFORD, H-07665**

has successfully completed a
twelve-session course of Anger Management
in an "Inmate's Guide to Anger Control"

Presented this 5th day of October, 2006.

Chaplain Judge C. Lindsey
Correctional Training Facility - Central



# Certificate of Completion

Awarded to:

**Clifford Brodsky**

On this 23rd day of February 2006 for faithfully completing the "Healing For The Angry Heart" video series in:

# ANGER MANAGEMENT

He has acquired the skills through practical biblical insights to deal with heart issues, discovered the secret to being heard, learned to release guilt, trust again and break habit cycles.

Richard Mireles
Education Deacon
CTF Central Chapel

Judge C. Lindsey
Protestant Chaplain
CTF Triplex Facility

# Certificate of Completion

*This document certifies that*

**Clifford Brodsky**

*has successfully completed*

Anger Management/Fatherhood

*awarded this* 1 *day of* October, 2005

*(Instructor)*

MUSLIM DEVELOPMENT CENTER
19 95
SOLEDAD, CALIFORNIA



Clifford Bredsky, H07665
P.O. Box 689 YW-308L
Soledad, CA 93960-0689
$ 07.35⁰
Clerk of the Court
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 ~~455~~ Golden Gate Avenue
SAN FRANCISCO, CA 94102